**Affirmed and Opinion filed January 10, 2012.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-10-00646-CR
_____

**ABIGAIL ELIZABETH YOUNG, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 232nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 1227879**

## OPINION

Appellant, Abigail Elizabeth Young, appeals her conviction for the offense of recklessly causing serious bodily injury to a child younger than fifteen years of age. *See* Tex. Penal Code Ann. § 22.04 (West 2011). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

About 8:30 in the evening on June 27, 2009, Benjamin Struesand was a passenger in a car driven by his wife. As they were returning home after dinner at a restaurant, they encountered a car stopped in the road. Struesand saw a lady getting out of the car as they drove by. Almost immediately, Struesand's wife and the other passenger in the car heard the lady yelling, and she pulled their car over to the side of the road. The two ladies walked back to the stopped car, and Struesand followed moments later. When Struesand approached the stopped car, he saw an unconscious child lying in the middle of the street. Struesand's wife, an LVN, had commenced CPR on the child. According to Struesand, the woman from the stopped car was standing about five to ten feet away from the child. The other passenger in Struesand's vehicle called 9-1-1.

Eventually emergency medical personnel arrived on the scene. Matthew Tomlinson, the paramedic treating the child, noticed an abnormal number of bruises all over the child's torso. These bruises did not appear to have been caused by the administration of CPR by a trained practitioner. Tomlinson testified that bruising was possible if the bystanders had done CPR for twenty to thirty minutes before EMS arrived. According to Tomlinson, the bruises on the child evidenced different stages of healing. Tomlinson testified that the child "was dead when [they] got there. She was not going to come back." In addition, Nancy Harris, an emergency room nurse trained in CPR, who had stopped to assist, testified that the child never appeared to be alive and never responded to CPR. Tomlinson also observed that when the paramedics arrived, appellant was walking around the scene talking to somebody on the telephone.

Harris County Deputy Sheriff Adam Hawyler arrived after the child had been placed in the back of an ambulance. Hawyler observed a female child wearing only panties. According to Hawyler, he immediately observed that the child's stomach

2

appeared distended and bruised on top. Hawyler also observed a cut on the child's bottom lip, redness around her mouth, and "bruising on her inner thighs relatively close to her vagina area." Hawyler also observed the woman from the stopped car in the back of the ambulance. He identified her as appellant, the child's mother. Hawyler also identified the child as four year old Emma Thompson.

Hawyler then asked appellant what had happened to Emma. Appellant told Hawyler that Emma had been sick with a urinary tract infection. Appellant explained that two hours earlier, Emma had an abnormally large bowel movement. Appellant then reported that Emma "didn't feel right, and [she] stood up on the floor, off of the toilet, fell backwards, hit her head, then fell forward onto the floor." Appellant also told Hawyler she had wiped blood off of Emma's face after she fell.

As Hawyler questioned appellant further, "she started getting a little bit aggravated at the fact that I was asking questions." Hawyler observed the location of appellant's vehicle and "it immediately sparked [his] curiosity as to why it appeared as if she was going back home rather than towards the hospital, which was in the opposite direction." After the ambulance left the scene, Hawyler went to secure appellant's residence to make certain "there weren't people coming in and out of the house."

Appellant told several bystanders that she was on the way to the emergency room when her daughter threw up and stopped breathing. Harris did not notice any vomit in Emma's mouth. Harris later drove appellant's car back to appellant's house. Harris testified that she did not notice any vomit or blood in the car. Harris also noticed that appellant's car was headed away from the hospital.

Emma was transported to the hospital where, after efforts to revive her failed, she was pronounced dead by emergency room physician Kevin Catney. According to Dr. Catney, it is very unusual to see a child as young as Emma arrive at the hospital in full

cardiac arrest. Dr. Catney testified that there is a less than one percent chance of resuscitation with a pediatric out-of-hospital cardiac arrest with no activity on a heart monitor. Dr. Catney observed numerous bruises and injuries on Emma's body. Dr. Catney also noted that prior to death, Emma would have been dizzy and disoriented because her blood sugar level was over 400. After he had pronounced Emma dead, the emergency room nurses informed Dr. Catney they had observed an injury in Emma's vaginal area.

During Emma's autopsy conducted on June 29, 2009, Dr. Patricia Moore found numerous injuries, including a distended stomach and marks on Emma's lower abdomen and around the belly button consistent with finger or knuckle marks. Dr. Moore also discovered that Emma had three fractured ribs.[1] In addition, Emma had experienced hyperglycemia as a result of an injury to her pancreas.[2] Dr. Moore found a large amount of blood in Emma's peritoneal cavity, an area where there should be no blood present.[3] The autopsy also revealed that a portion of Emma's transverse colon had hemorrhagic necrosis or recent tissue death. Dr. Moore's examination found a 2.5 by 1.5 centimeter tear across Emma's vagina consistent with a large object's being inserted into it. Dr. Moore also found fresh blood in Emma's vagina, indicating that the injury had occurred within 24 hours of Emma's death. According to Dr. Moore, while Emma could have walked with this injury, it would have caused her significant pain. In addition, Emma would have bled continuously unless the wound were sutured. Dr. Moore also found contusions of the right forehead, the nose, left cheek, a laceration of the lip, a one-inch,

---

[1] Dr. Moore determined that two of the rib fractures had occurred within 24 to 48 hours of Emma's death, while the third fracture was three to five days old. In addition, Dr. Moore testified that while it was conceivable the fractures were caused by the efforts to save Emma's life, she did not believe that they were the result of CPR.

[2] Dr. Moore also found injuries to Emma's liver and stomach. Dr. Moore opined that a large amount of force was needed to produce these types of injuries.

[3] Dr. Moore explained that the large amount of blood in the peritoneal cavity was the cause of Emma's distended abdomen.

4

gaping laceration to Emma's scalp, and a skull fracture. Dr. Moore opined that these injuries were inconsistent with a mere fall. Dr. Moore determined that Emma's death was caused by blunt force trauma to the abdomen, resulting in blood loss and damage to the pancreas.

An investigation into Emma's death began immediately. The investigation revealed that in the months prior to Emma's death, appellant, while still married to Emma's father Benjamin Thompson, began a romantic relationship with Lucas Coe. At the time the relationship began, Coe was on deferred adjudication community supervision for aggravated assault. Coe was eventually imprisoned for failure to pay the court-ordered restitution. Appellant paid half of Coe's $20,000.00 restitution to obtain his release.

Appellant accompanied Coe to court on numerous occasions, and she was aware that he had twice been charged with injury to a child. Coe's mother, Donna Hamilton, was appointed joint managing conservator of his daughter, and she designated appellant as one of the individuals who could supervise Coe's visitations with his daughter. Hamilton specifically explained to appellant that Coe could not be left alone with his daughter. Appellant downplayed Coe's criminal history to her family to avoid their concerns.

Appellant worked as a registered nurse at two jobs: as a labor and delivery nurse at Texas Women's Hospital, and as a nurse for a high risk obstetrical home-care company called Healthy Connections. Appellant was trained to identify herpetic lesions. In 2004, 2005, 2006, 2007, and 2008, appellant had taken a number of courses training her to identify and assess victims of abuse and neglect.

Prior to the events at issue in this appeal, appellant typically left Emma at the South Montgomery County YMCA in the Woodlands during working hours. However,

beginning around May 17, 2009, appellant almost completely stopped taking Emma to the YMCA.   Instead, appellant allowed Coe to babysit Emma and her other children.

Emma's father moved out of the family home in April of 2009.   Both appellant and Thompson agreed that Thompson would keep Emma and her two sisters, J.T. and L.D., every other weekend.   While Thompson saw nothing unusual with Emma on the weekend of May 22, 2009, he noticed that Emma was "covered in bruises" when he picked her and her sisters up on June 5, 2009.   Emma had marks on her nose, lip, back, and stomach.   Thompson asked his daughters about the bruises, but they all said that Emma had fallen down.   On June 6, Emma whimpered when she went to the bathroom, and Thompson called appellant to report a possible bladder infection.    When Emma went to the bathroom on June 7, Thompson heard her scream.   Although Thompson asked appellant to take Emma to a doctor that night, appellant replied that she would take Emma the following morning.   Thompson trusted appellant regarding the children's health decisions because she was a registered nurse.   After Emma's death, appellant admitted to Thompson that she "may have let a bad person around our children."

On June 8, 2009, appellant took Emma to see her pediatrician, Dr. Poonam Singh. Appellant had called Dr. Singh's office on June 4 about concerns that Emma was bruising easily.   Emma's chief complaints were bruising, burning urination, a fever of 102.3, and discharge after urination.   Dr. Singh noticed bruising on Emma's ribcage and the anterior abdominal wall, but she was told by appellant that Emma had run into some furniture two months back and had fallen off her bed ten days before.   When asked about the bruises on Emma's chest, appellant reported that she had made thumb marks on Emma when she picked her up.   Dr. Singh ran blood tests and found no medical explanation for the bruising.   The x-rays Dr. Singh took of Emma's chest area did not reveal any injuries to Emma's ribs.   In addition, Emma's blood glucose was in the normal range.

When Dr. Singh asked Emma specifically whether anyone had hurt her, Emma responded: "Luke held me tight." Appellant told Dr. Singh that Luke was a family friend who had come over to fix the garage. Appellant also told Dr. Singh that she did not suspect possible physical or sexual abuse. During her meeting with Dr. Singh, appellant did not act concerned for her daughter and gave Dr. Singh the impression that Luke was a casual acquaintance who came to work on appellant's garage and who brought his own daughter to play with Emma. When Emma told Dr. Singh that Luke held her tight, appellant did not ask Emma what she meant by that comment. Appellant did not mention that Coe was her boyfriend, that Coe was staying at her house, or that he had been babysitting Emma. According to Dr. Singh, this information, combined with appellant's discussion of her pending divorce from Emma's father, would have been "a big red flag for … child abuse." Despite the lack of this important information, Dr. Singh made a referral to CPS based on the unexplained bruising.

During her examination, Dr. Singh noticed vesicles on Emma's index finger, on the roof of her mouth, and on her genitalia. Dr. Singh suspected the vesicles were some type of herpes-like illness. Dr. Singh performed a vaginal swab for a viral culture.

Kimberly Clayton was the CPS caseworker assigned to Emma's case after Dr. Singh's report. She tried to make contact with appellant on June 9 and June 10, but no one was home. Clayton left her business card at appellant's house after her second unsuccessful attempt to make contact. Melissa Green, appellant's friend from childhood, testified that appellant called her frantic, and described driving up to her house when she saw a CPS worker standing at her front door. Appellant drove by without stopping because the children and Coe were in the car with her. Appellant returned Clayton's call, and they set up an initial meeting for June 11, 2009. During this initial meeting, Clayton did not observe any bruising on Emma. Clayton thought Emma appeared somewhat shy and standoffish. Appellant explained that the bruising sparking Dr. Singh's concern had resulted from Emma's falling off of her bed and hitting a step

7

stool. Clayton thought that appellant appeared very open and that appellant answered her questions. But when asked who was living in the home, appellant did not mention Coe. In addition, when asked who watched the children, appellant did not mention that Coe regularly babysat for her. Because the oldest child, L.D., was not present for the first interview, Clayton scheduled a second interview for June 17, 2009.

On June 12, before the second interview, Dr. Singh received the results of Emma's vaginal swab. The test indicated that Emma had contracted herpes type 2, a traditionally sexually transmitted disease. Dr. Singh called CPS to inform them that herpes type 2 is almost always sexually transmitted and that Emma should be evaluated at a sexual abuse clinic. Dr. Singh also called appellant, but her answering machine was not accepting messages. Appellant returned Dr. Singh's call on Monday, June 16.

On June 16, appellant went to speak with Dr. Tim Waterhouse, her boss at Healthy Connections. Appellant told Dr. Waterhouse that Emma had been diagnosed with herpes type 2. Dr. Waterhouse testified that he was horrified because he knew that herpes type 2 is a sexually transmitted disease, information he explicitly transmitted to appellant. Appellant denied that Emma could have contracted this disease from someone in the home. Appellant did not mention Coe to Dr. Waterhouse. When appellant suggested that Emma had possibly contracted the disease from either a towel or a swim suit, Dr. Waterhouse rejected that theory, insisting that herpes type 2 was a sexually transmitted disease. Appellant maintained that the disease must have been transmitted to Emma some way other than sexually. Dr. Waterhouse testified that it is very uncommon for someone to inoculate with herpes type 2 by touching a lesion and then touching some other part of the body. Dr. Waterhouse encouraged appellant to have Emma re-tested if she were skeptical about the results from the initial test. Eventually Coe, appellant, and Thompson, Emma's father, were tested for herpes type 2. Coe and appellant tested positive; Thompson's test was negative.

8

On June 14, 2009, Amanda Matthews, appellant's sister, was visiting at appellant's house and she tucked Emma into bed for the night. Matthews thought Emma appeared clingy and afraid. Matthews testified that Emma asked her "if Mr. Luke was going to come upstairs." When Amanda asked if Emma was afraid of Coe, Emma told her no, but she wanted Matthews to tuck her in. Emma also asked Matthews to close the door after tucking her into bed. Matthews asked appellant about Emma's comment. Appellant responded that Coe never tucks in the girls or goes upstairs. Matthews did not report this conversation to the police or CPS.

On June 17, 2009, appellant took Emma to be examined at Texas Children's Hospital. At Texas Children's, Emma was seen by Tammy Herrera-Aguilera, a sexual assault nurse examiner ("SANE"). Herrera-Aguilera's examination of Emma revealed no indication of trauma. During her trial testimony Herrera-Aguilera agreed that it is possible for herpes type 2 to be spread in a non-sexual manner. However, Herrera-Aguilera also acknowledged that it is very rarely found in children because it is normally passed through sexual contact. Moreover, Herrera-Aguilera explained that any injury to Emma's vagina would have healed within three to four days after any injury, and the majority of sexual assault examinations on children are normal with no injuries, bruising, tearing, or bleeding. According to Herrera-Aguilera, if Emma had been sexually assaulted two weeks before June 17, any resulting injury would have been completely healed.[4]

During her examination of Emma, Herrera-Aguilera asked appellant if Emma had been recently exposed to any new people in her life. Appellant indicated that the only people living in the home at that time were the father, herself, Emma, and Emma's two sisters. Appellant did not tell Herrera-Aguilera that she was actually separated from

---

[4] Dr. Moore testified that, during her autopsy of Emma, she found evidence of older injuries to Emma's vagina in addition to the significant recent tearing.

9

Emma's father, that she had a new boyfriend who was babysitting Emma, or that Emma told Dr. Singh that the new boyfriend held her too tight.

After the sexual assault examination, appellant told Dr. Singh that Emma had gotten herpes from a wet swimsuit. She made this report even though: neither the SANE nurse nor the attending physician had so informed her; even though Dr. Waterhouse had informed her that herpes type 2 is not spread from a wet swimsuit or a towel; and even though, according to the YMCA director, Emma was not taking swimming lessons and would have had no reason to use a swimsuit or a towel.

Before appellant and Thompson met with Clayton on June 17, appellant told Thompson to not mention Coe during the meeting. Appellant explained that if Thompson said anything, then CPS would barge into their lives and not leave. Despite his suspicions about Coe and his concerns for Emma, Thompson did not mention Coe to Clayton. Appellant also did not mention Coe during the meeting. Clayton observed that Emma appeared very comfortable with her father, and Clayton came to the conclusion that Thompson was not a perpetrator. Clayton also spoke to Emma's sisters, J.T. and L.D., outside the presence of their parents, and neither mentioned Coe. Appellant later told Green, her long-time friend, that she had told J.T. and L.D. to not say anything about Coe to CPS and to say she did not have a boyfriend.

On June 21, 2009, appellant and Coe went with Matthews and her family to Surfside Beach. Matthews testified that appellant was in obvious pain and she sat on an ice bag in a chair for most of the day. Appellant claimed it was a urinary tract infection along with an external yeast infection. On June 22, appellant called her doctor, Dr. Valdez, complaining of a herpes type 1 outbreak in her vaginal area, and requested medication. Appellant declined to come into Dr. Valdez's office, stating "she was not going to drop her pants" for him. Appellant went to Dr. Valdez's office on June 25, 2009 for an exam, but she declined the pelvic exam. Appellant ultimately tested positive for the herpes type 2 virus.

10

On the evening of June 26, 2009, appellant's next-door neighbor, Christie Frazier, saw appellant and Emma walking out of their front door toward appellant's car. Appellant called out to Frazier, and when Frazier looked up, she saw Emma wearing a pair of panties with bright red blood on them. Frazier also observed that Emma was acting sad and quiet. Appellant told Frazier that Emma had scratched her vagina getting out of the pool. Emma's sister also stated that she had seen blood in Emma's underwear, and police recovered bloody underwear from trash bags found inside appellant's garage.

On June 27, 2009, appellant left all three of her daughters at home alone with Coe many times. Appellant went to get doughnuts in the morning and groceries in the afternoon. While appellant was out in the morning, L.D. heard Emma fall in the kitchen, and Coe took Emma into appellant's bathroom to bathe her. L.D. saw Emma later that day, and Emma appeared to be okay. L.D. later went outside to swim while Emma stayed inside the house and took a nap in appellant's bedroom. According to L.D., Coe stayed inside with Emma. Appellant was videotaped shopping at a Randall's grocery store around 7:30 p.m. Crazy Glue was among the items appellant purchased at the Randall's.

Appellant's cellular telephone records indicate that appellant called Dr. Singh's office twice at about 6:30 that evening. At 8:29 p.m., appellant called Dr. Singh again and reported that she believed Emma had a urinary tract infection. Appellant asked Dr. Singh to call in a prescription for an antibiotic. Dr. Singh refused and recommended that appellant take Emma to an urgent care clinic or an emergency room. When appellant took Emma out of the bedroom to the hospital, L.D. reported that she appeared droopy and her eyes were half closed.

After leaving the house, stopping on the road with Emma, appellant called Coe at 8:49 p.m. Coe called appellant back at 8:50 p.m. Then, three minutes later, appellant called 9-1-1. L.D. testified that, after Coe received a telephone call, he started acting

11

weird, like he had to get everything done and get out of appellant's house quickly. Frazier testified that she saw Coe pacing up and down appellant's driveway speaking on his cellular telephone. Frazier spoke on the telephone with appellant, who was very upset. She then gave Coe and his daughter a ride to a nearby Jack-in-the-Box. Once Frazier drove into the restaurant parking lot, Coe jumped out of Frazier's vehicle. He grabbed a bag and his daughter, and they got into a truck with Coe's sister and her husband. Frazier drove off at that point.

After Emma's death, police searched appellant's house and found a number of cleaning supplies in appellant's bathroom. Dr. Moore testified that, as a result of her injuries, Emma would have bled profusely. Appellant later told Frazier and others that Emma had fallen off of a toilet and hit her head; she had used Super Glue to try to close the wound. Frazier was in nursing school at that time and while she was familiar with the use of Dermabond to close wounds, she did not believe Super Glue and Dermabond were the same thing. In addition, Tomlinson, the paramedic who had worked on resuscitating Emma, testified that Emma's cuts required medical intervention, specifically sutures. Tomlinson also explained that Dermabond would not have been used on her scalp because Dermabond loses its' effectiveness when it gets wet.

The State charged appellant with intentional and knowing injury to a child by omission resulting in serious bodily injury to Emma by failing to provide adequate medical attention, adequate care, adequate protection, and adequate adult supervision. At the close of evidence, the jury was instructed on the lesser-included offense of reckless injury to a child based upon appellant's failure to provide adequate medical attention, care, and protection. The jury found appellant guilty of recklessly causing serious bodily injury to a child younger than fifteen years of age. The jury sentenced appellant to the maximum possible sentence, twenty years' confinement in the Institutional Division of the Texas Department of Criminal Justice and assessed a $10,000.00 fine. This appeal followed.

12

## DISCUSSION

Appellant raises four issues on appeal, which we address in turn.

## I.      Sufficiency of the Evidence

In her first issue, appellant contends that the evidence is legally insufficient to prove beyond a reasonable doubt that she had the requisite mens rea to support a conviction for recklessly causing serious bodily injury to a child younger than fifteen years of age.   We examine the record, summarized above, to determine whether there is sufficient evidence to establish that appellant acted recklessly.

### A.      The Standard of Review and Applicable Law

In a sufficiency review, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.   *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality opinion); *Pomier v. State*, 326 S.W.3d 373, 378 (Tex. App.—Houston [14th Dist.] 2010, no pet.).   Our review includes both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).   Direct and circumstantial evidence are treated equally.   *Id.*   The jury, as the sole judge of the credibility of the witnesses, is free to believe or disbelieve all or part of a witness's testimony.   *Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998).   The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses to, disbelieve any or all of the

13

evidence or testimony proffered, and weigh the evidence as it sees fit. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Reconciliation of conflicts in the evidence is within the jury's discretion, and such conflicts alone will not call for reversal if there is enough credible evidence to support a conviction. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986). An appellate court may not re-evaluate the weight and credibility of the evidence produced at trial and in so doing substitute its judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). We do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure that the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); *Harris v. State*, 164 S.W.3d 775, 784 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curry*, 30 S.W.3d at 404. "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villareal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

Under the Texas Penal Code, "[a] person commits an offense [of injury to a child] if he … intentionally, knowingly, or recklessly by omission, causes to a child … serious bodily injury…." Tex. Penal Code Ann. § 22.04(a)(1) (West 2011); *Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006). A child is a person fourteen years of age or younger. Tex. Penal Code Ann. § 22.04(c)(1). "'Serious bodily injury' means bodily injury that creates a substantial risk of death, or that causes death." *Id.* at §

14

1.07(a)(46).   Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct.   *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).   A person acts recklessly or is reckless with respect to the result of her conduct when she is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur.   *Id.*   "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."   Tex. Penal Code Ann. § 6.03(c) (West 2011).   If the actor was aware of the risk she was creating, and consciously disregarded that risk, however much she may have hoped that no harm would result, she was acting recklessly. *Williams*, 235 S.W.3d at 751.   Direct evidence of the required mental state is not required.   *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).   Instead, the required culpable mental state may be inferred from the surrounding circumstances. *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).

## B.    Analysis

Appellant was a registered nurse who worked as a labor and delivery nurse.   In that role, she had been trained to recognize herpes-type lesions and had extensive training on identification and assessment of victims of abuse and neglect.   Appellant was also aware of Coe's past criminal behavior and CPS investigations.   She knew that Coe was not allowed unsupervised visitation with his own daughter.   Despite this knowledge, appellant allowed Coe to frequently babysit her children, including Emma.   Even when Emma's medical issues, including unexplained bruising and the herpes type 2 virus, became evident, appellant continued to allow Coe to have unsupervised access to Emma. In addition, appellant repeatedly lied about Coe and encouraged others, including her own daughters, to do so as well.   By consciously choosing to lie about Coe's access to Emma, appellant exposed her to further abuse and thwarted efforts to investigate the real

15

cause of Emma's injuries. Finally, the evidence demonstrated that appellant was aware of Emma's serious injuries in her final days, yet appellant delayed seeking medical treatment until it was too late to save her life. We hold that the evidence is sufficient to support appellant's conviction under all three theories submitted to the jury.[5] *See Guevara v.* State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (noting that attempts to conceal incriminating evidence are probative of wrongful conduct and is a circumstance of guilt); *Johnston v. State*, 150 S.W.3d 630, 636 (Tex. App.—Austin 2004, no pet.) (stating that although the evidence leads to the conclusion that the defendant chose not to take the child to the hospital out of fear his abuse of the child would be discovered rather than to inflict injury, the evidence "also shows that [the defendant] was aware of [the child's] dire medical condition and the need to take him to the hospital."); *Payton v. State*, 106 S.W.3d 326, 330 (Tex. App.—Fort Worth 2003, pet. ref'd) (holding that defendant, who had emergency medical training, recklessly caused child's injury when he failed to obtain reasonable medical care for his grandson who was experiencing visible signs of medical distress); *Patterson v. State*, 46 S.W.3d 294, 303–04 (Tex. App.—Fort Worth 2001, pet. ref'd) (holding that defendant recklessly caused serious bodily injury by failing to call 9-1-1 and identify her boyfriend as the violent kidnapper of her children). We overrule appellant's first issue.

## II.    Exclusion of Dr. Gilhousen's Testimony

In her second issue on appeal, appellant contends that the trial court erred when it excluded Dr. Michael Gilhousen's proposed testimony regarding psychological evaluations of Coe in 2005 and 2007 on the basis of relevancy. In her third issue,

---

[5] The three theories submitted to the jury were that appellant recklessly caused serious bodily injury to Emma by failing to provide (1) adequate medical attention; (2) adequate care; and (3) adequate protection. The jury found appellant "guilty of recklessly causing serious bodily injury to a child younger than fifteen years of age."

16

appellant contends that this exclusion of Dr. Gilhousen's testimony violated her Sixth Amendment right to present a complete defense.   We address these issues together.

### A.      The Standard of Review and Applicable Law

A trial court's decision to exclude an expert's testimony is reviewed for an abuse of discretion.   *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).   If the trial court's ruling lies within the zone of reasonable disagreement, it will not be reversed on appeal.   *Id.*

Admission of expert testimony is governed by Texas Rule of Evidence 702. *Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000).   Rule 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."   Tex. R. Evid. 702.   The proponent of the expert testimony must show by clear and convincing proof that the evidence he seeks to introduce is sufficiently relevant and reliable to assist the trier of fact in reaching an accurate result. *Tillman v. State*, No. PD-0727-10, 2011 WL 4577675, at *9 (Tex. Crim. App. October 5, 2011).

"Relevance is 'a looser notion than reliability' and is 'a simpler, more straight-forward matter to establish.'"   *Id.* at *12 (quoting *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)).   The relevance inquiry is whether the evidence will assist the trier of fact and is sufficiently tied to the facts of the case.   *Id.*   Therefore, to

be relevant, expert testimony must tie pertinent facts of the case to the scientific principles which are the subjects of the testimony.   *Id.*

### B.   Analysis

Assuming without deciding that the trial court erred when it excluded Dr. Gilhousen's testimony, we turn next to appellant's contention the exclusion of Dr. Gilhousen's testimony violated his Sixth Amendment right to present a complete defense. In Texas, the improper exclusion of evidence may raise a constitutional violation in two circumstances: (1) when an evidentiary rule categorically and arbitrarily prohibits the defendant from offering relevant evidence that is vital to his defense; or (2) when a trial court erroneously excludes evidence that is vital to the case, and the exclusion precludes the defendant from presenting a defense.   *Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005).   However, the Court of Criminal Appeals has noted that erroneous evidentiary rulings rarely rise to the level of denying a fundamental constitutional right to present a meaningful defense.   *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002).   Only where the trial court's clearly erroneous ruling excludes otherwise relevant, reliable evidence which forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense is there a constitutional violation.   *Id.*

Appellant sought to introduce Dr. Gilhousen's testimony to refute the element of criminal intent in allowing Coe unsupervised access to Emma.   She argues that Coe was capable of maintaining a facade of non-threatening behavior around children. According to appellant, Dr. Gilhousen's testimony would have demonstrated that, at least in 2005 and 2007, Coe was able to deceive Dr. Gilhousen, a psychologist retained by CPS, regarding whether or not Coe represented a danger to children.[6]   Appellant argues

---

[6] Appellant's specific argument was as follows: "If Mr. Coe was able to —if we assume, as the State is suggesting, that he has committed this sexual assault …, the nexus is, if he was able to fool a PHD psychologist that I'm not an offender, that I am safe, that is clearly the nexus in this case, because if he's able to fool him, he's able to fool [appellant]."   While we do not agree with appellant that Dr. Gilhousen

that because she was not allowed to present that testimony to the jury, she was effectively precluded from refuting allegations of criminal intent when she left Emma in Coe's care. Because appellant was able to present this theory through the testimony of other witnesses and then emphasized the defense to the jury during closing argument, we conclude she was not effectively precluded from presenting a defense.[7] We therefore apply the harmless error standard found in Rule 44.2(b) of the Texas Rules of Appellate Procedure. *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002).

A non-constitutional error that does not affect substantial rights does not justify overturning the verdict. *Id.* at 666. A substantial right is affected if the error had a substantial and injurious effect or influence in determining the jury's verdict. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005). If the error did not influence the jury, or had only a slight effect, the error is harmless. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). An appellate court should consider everything in the record to determine the likelihood the jury's decision was affected by the error. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). This includes such factors as evidence and testimony admitted to the jury's consideration, the nature of the evidence supporting the verdict, the character of the error, and how the error may be considered in connection with other evidence in the case. *Id.* We may also consider jury instructions, both parties' theories of the case, closing arguments, and whether the State emphasized the error. *Id.*

---

opined that Coe did not represent a threat to children, we will accept appellant's argument for purposes of argument on appeal.

[7] Among these witnesses were appellant's sister, Amanda Matthews, and appellant's neighbor, Christie Frazier. Matthews testified that, when she first met Coe, she "thought he was a country boy, nothing spectacular, but nothing bad." Matthews spent two days at appellant's home along with Coe. Matthews testified that nothing Coe said or did during that stay caused her any concern. Matthews also testified she was not concerned with Coe accompanying her family, including her daughter, on a trip to the beach, and then staying overnight in Matthew's apartment following that trip. Frazier testified that she had known Coe for many years. Frazier testified she was never concerned that Coe's presence in appellant's home and around appellant's children represented a threat of any kind to the safety of appellant's children.

The jury acquitted appellant of intentionally or knowingly causing serious bodily injury to Emma. The jury was also instructed on the offense of reckless injury to a child. The jury was instructed that they could convict appellant of reckless injury to a child under any of three theories: (1) failure to provide adequate medical attention; (2) failure to provide adequate care; or (3) failure to provide adequate protection. The jury found appellant "guilty of recklessly causing serious bodily injury to a child younger than fifteen years of age." We have already found the evidence sufficient to support appellant's conviction under all three theories submitted to the jury. Because appellant's issue regarding Dr. Gilhousen's excluded testimony addressed only failure to provide adequate protection, and we have found the evidence supporting all three sufficient, we conclude that the trial court's error in excluding Dr. Gilhousen from testifying was harmless. *See Lucio v. State*, No. AP-76020, 2011 WL 4347044, at * 21 n.25 (Tex. Crim. App. September 14, 2011) (noting that, in light of other evidence of guilt, error in excluding expert's opinion was harmless error under Rule 44.2(b) of the Texas Rules of Appellate Procedure). We overrule appellant's second and third issues.

### III. Ex Post Facto

In *Brooks v. State*, the Court of Criminal Appeals determined that the only standard a reviewing court should apply when evaluating whether the evidence is sufficient to support each element of a criminal offense is the standard for legal sufficiency set out in *Jackson v. Virginia* cited above. *Brooks*, 323 S.W.3d at 894–95. By doing so, the Court of Criminal Appeals abolished factual sufficiency review. *See Howard v. State*, 333S.W.3d137, 138 n.2 (Tex. Crim. App. 2011). In her fourth issue, appellant contends that by abolishing factual sufficiency review, which appellant contends is mandated by the Texas Constitution, the Court of Criminal Appeals has violated the ban on ex post facto laws found in Article I, § 16 of the Texas Constitution.

"The proscription against ex post facto laws 'necessarily requires some explanation; for, naked and without explanation, it is unintelligible, and means nothing.'" *Carmell v.*

20

*Texas*, 529 U.S. 513, 521 (2000) (quoting *Calder v. Bull*, 3 Dall. 386, 390, 1 L.Ed.648 (1798)). Both the United States and Texas Constitutions prohibit Texas from applying any ex post facto law. U.S. CONST. art. I, § 10, cl. 1; TEX. CONST. art. I, § 16. Texas interprets the proscription against ex post facto laws in the Texas Constitution to have the same meaning as the proscription against ex post facto laws found in the United States Constitution. *Grimes v. State*, 807 S.W.2d 582, 586 (Tex. Crim. App. 1991). The ex post facto clauses found in both the United States and Texas Constitutions prohibit four types of laws. They prohibit (1) laws that make an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action; (2) every law that aggravates a crime, or makes it greater than it was, when committed; (3) every law that changes the punishment and inflicts a greater punishment than the law annexed to the crime when it was committed; and (4) every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense in order to convict the offender. *Carmell*, 529 U.S. at 522 (quoting *Calder*, 3 Dall. at 390). When an appellate court engages in an ex post facto analysis, its sole concern is whether the statute assigns more severe criminal or penal consequences to an act than did the law in place when the act occurred, and it is irrelevant whether the statutory change touches any vested rights.[8] *Grimes*, 807 S.W.2d at 587 (citing *Weaver v. Graham*, 450 U.S. 24, 29 n. 13, 101 S. Ct. 960, 964, n.13, 67 L.Ed.2d 17 (1981)).

In addition, "the prohibition against ex post facto laws is a prohibition against legislative and not judicial action." *Ex parte Bonham*, 707 S.W.2d 107, 108 n. 1 (Tex. Crim. App. 1986). However, "a judicial decision having an unjust retroactive application is barred by the due process provisions of the Fifth and Fourteenth Amendments to the United States Constitution rather than Article I, Section 10's ex post facto provision." *Id.*

---

[8] A "vested right" is a right that has been acquired under a law existing at a particular point in time. *City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex. 1997). Prior to the Supreme Court's *Weaver* opinion, and the Court of Criminal Appeals' opinion in *Grimes*, the concept of a retroactive law infringing on a pre-existing right had been considered when determining whether a statute violated the constitutional prohibition of ex post facto laws. *See Grimes v. State*, 807 S.W.2d 582, 583–87 (Tex. Crim. App. 1991).

21

An unforeseeable judicial construction of a criminal statute, applied retroactively, can function like an ex post facto law and violate the Due Process Clause. *See Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). Courts may limit the retroactive effect of a decision if they choose to do so, but judicial decisions are normally retroactive. *Proctor v. State*, 967 S.W.2d 840, 845 n. 5 (Tex. Crim. App. 1998); *Callison v. State*, 218 S.W.3d 822, 825 (Tex. App.—Beaumont 2007, no pet.). "A state judicial decision may not operate retroactively if it has the effect of depriving persons of fair warning of what conduct will give rise to criminal penalties." *Proctor*, 967 S.W.2d at 845. But a decision may apply retroactively if it does not alter an offense's definition, range of punishment, or substantive defenses. *Id.*

In her fourth issue, appellant does not argue that the *Brooks* opinion retroactively converted an act that was not criminal at the time it was committed, into a criminal act. Appellant also does not argue that the *Brooks* opinion increased the punishment for a criminal act from the punishment in place when the act was committed, or that it deprived her of a defense that was available at the time the offense was committed. Instead, citing the Supreme Court's *Carmell v. Texas* opinion, appellant argues the Court of Criminal Appeals' abolition of the separate factual sufficiency standard of review violates the prohibition against ex post facto laws because it falls within the fourth *Calder v. Bull* category.[9] *See Carmell*, 529 U.S. at 522. More specifically, appellant contends she "had a right to rely on established precedent that she would receive a factual sufficiency review of the evidence presented to the trial court." Appellant's argument continues: "when a state court overrules a consistent line of procedural decisions with the retroactive effect of denying a litigant a hearing in a pending case, it thereby deprives her of due process of law

---

[9] In *Carmell*, the Supreme Court held that a revised version of Texas Code of Criminal Procedure Article 38.07, which lessened the quantum of evidence required to convict, fell within the fourth *Calder v. Bull* category of ex post facto laws. *Carmell v. Texas*, 529 U.S. 513, 530 (2000). That fourth category prohibits any law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender. *Id.* at 522.

in its primary sense of an opportunity to be heard and to defend [her] substantive right." (internal quotations omitted).

We believe appellant's reliance on *Carmel* is misplaced. First and foremost, *Carmel* involved a change in the legally sufficient amount and type of evidence required to convict a defendant at the trial court level. *Id.* at 530. In *Carmel*, the Supreme Court noted that "under the law in effect at the time the acts were committed, the prosecutor's case [against Carmel] was legally insufficient and [Carmel] was entitled to a judgment of acquittal." *Id.* at 530. *Brooks* on the other hand addresses the standard of review to apply when an appellant challenges on appeal the sufficiency of the evidence supporting her conviction. *Brooks*, 323 S.W.3d at 894–95. *Brooks* does not address the amount or type of evidence required to convict a criminal defendant.

Appellant had her day in court. The jury acquitted her of intentionally or knowingly causing serious bodily injury to Emma. The jury then determined that, beyond a reasonable doubt, she was guilty of the offense of recklessly causing serious bodily injury to a child younger than fifteen years of age. The elements of that offense were the same on the day she was convicted as they were when the crime was committed. In addition, on appeal, we have determined the evidence is sufficient to support her conviction. So, unlike the situation found in *Carmell*, applying the legal sufficiency standard of review in appellant's case does not create a situation that lowers the State's burden of proof at trial or eliminates an element of the offense.

Because the Court of Criminal Appeals' decision in *Brooks* (1) does not punish as a crime an act previously committed that was not a criminal act when it was committed; (2) does not aggravate a crime or increase the punishment for a criminal act from the punishment in place when the act was committed; (3) does not deprive appellant of a defense that was available when the criminal act was committed; and (4) does not alter the rules of evidence and thereby reduce the proof necessary to convict the offender; we hold that the Court of Criminal Appeals' decision to change the standard of review for

23

sufficiency claims does not constitute an ex post facto violation. *See Grimes*, 807 S.W.2d at 587, 588 (holding that the legislature's enactment of Code of Criminal Procedure Article 44.29(b), which changed the law so that reversible error during the punishment phase of a trial would result only in a new punishment hearing rather than a completely new trial, did not constitute an ex post facto violation under either federal or Texas constitutions). We overrule appellant's fourth issue.

## CONCLUSION

Having overruled all of appellant's issues on appeal, we affirm the trial court's judgment.

/s/        Adele Hedges
                 Chief Justice

Panel consists of Chief Justice Hedges, Justice Christopher, and the Honorable Vanessa Velasquez, Judge of the 183rd District Court of Harris County, sitting by assignment pursuant to section 74.003(h) of the Government Code. *See* Tex. Gov't Code Ann. § 74.003(h) (West 2005).

Publish — TEX. R. APP. P. 47.2(b).