**Ronald CROW, Appellant**

v.

**The STATE of Texas, Appellee**

**NO. 14-13-00512-CR**

Court of Appeals of Texas,
Houston (14th Dist.).

Majority and Dissenting Opinions
filed July 21, 2016

J. Sidney Crowley, Richmond, TX, for Appellant.

Charles Karakashian, Jr., Gatesville, TX, for State.

Panel consists of Justices Boyce, Christopher, and Jamison (Jamison, J., dissenting).

## OPINION

William J. Boyce, Justice

A jury convicted Ronald Crow of injury to a disabled individual, a second-degree felony, and assessed punishment of two years' imprisonment and a fine of $10,000. *See* Tex. Penal Code Ann. § 22.04 (West 2011). In one issue, appellant contends the evidence is insufficient to establish the complainant suffered bodily injury. We modify the judgment and affirm it as modified.

### BACKGROUND

The complainant, Benjamin Vaughan, resided at the Brenham State Supported Living Center. This facility is "a state-supported and structured residential facility operated by the Department of Aging and Disability Services to provide to clients with an intellectual disability a variety of services, including medical treatment, specialized therapy, and training in the acquisition of personal, social, and vocational skills." Tex. Health & Safety Code Ann. § 531.002(19) (West Supp. 2015).

Vaughan, who was 33 years old at the time of trial, has the mental age of a one-year-old child. He has been diagnosed with profound mental retardation, autism, attention deficit hyperactivity disorder, and pica disorder, which is ingestion of non-nutritive substances like paper. Vaughn cannot speak, except he will occasionally say "mama, mama" or babble. He depends completely on staff at the Living Center to feed him, dress him, and protect him from harm. Although many of the Living Center's residents may be supervised in a group, Vaughn requires one-to-one supervision. A staff member must be with him at all times he is awake.

Appellant was a direct care provider at the Living Center. He assisted residents with dressing, toileting, and eating. Appellant met Vaughn the first year he worked at the Living Center, but he had not supervised Vaughn individually. Appellant knew Vaughn is "a runner," which means Vaughn runs out the door at every opportunity.

### A. The Incident

On December 30, 2010, appellant was assigned to supervise Vaughn for two hours, beginning at 10:00 a.m. As is protocol for one-on-one supervision, appellant received a binder of information about Vaughn. From that binder, appellant learned Vaughn had pica disorder and was hyperactive. He also learned Vaughn liked to look out windows and play with blocks near windows.

Vaughn was sitting in a rocking chair in the day room when appellant began his shift. The day room is a "pretty good-size room," according to appellant, with eight classrooms attached to it. The day room has no windows, but the classrooms do.

Appellant sat next to Vaughn and began reading the binder. Anytime Vaughn got out of his line of vision, appellant was required to go see where Vaughn was. Vaughn went into a classroom where a maintenance man was working three times. Appellant brought Vaughn back to the day room the first and third times; Vaughn returned on his own the second time.

The incident at issue occurred in one of the classrooms. The trial court admitted a short video (without audio) of the incident as State's Exhibit 2. The images on the video were captured by a surveillance camera at the Living Center. The video shows the following events:

10:11:09 a.m. Vaughn and appellant walk into a room with five people sitting in it. Vaughn is touching his left ear with his left hand. According to his psychologist, that posture is typical for Vaughn and is related to his autism. Appellant is directly behind Vaughn.

10:11:12 a.m. Appellant, still behind Vaughn, puts his right hand on Vaughn's right shoulder for one second.

10:11:17 a.m. Vaughn and appellant reach a wall and stop walking.

10:11:18 a.m. Appellant pivots to his right so he is facing the doorway through which he and Vaughn entered the room.

10:11:20 a.m. Appellant pivots back towards Vaughn, raises his right arm, and swings it toward Vaughn. Appellant's right hand appears to be in a fist and appears to make contact with the left side of Vaughn's head. Vaughn's left hand comes off his ear, and he begins falling to his right.

10:11:21 a.m. Vaughn falls out of frame of the video.

10:11:22 a.m. Appellant looks up directly into lens of surveillance camera.

10:11:23 a.m. Appellant extends his right hand to the area where Vaughn fell out of frame.

10:11:27 a.m. Vaughn comes back into frame. Appellant has his right arm around Vaughn.

10:11:33 a.m. Still with his right arm around Vaughn, appellant and Vaughn begin walking out of the room.

10:11:42 a.m. Appellant and Vaughn exit the room.

The parties' interpretations of this 33-second period differ greatly.

Suggesting appellant was frustrated at repeatedly having to follow Vaughn and bring him back to the day room, the State posits that appellant followed Vaughn into a room; turned to make sure nobody was looking; punched Vaughn in the head; then picked him up "like nothing ever happened." The State's evidence to support this theory came from Diane Ganske, a security officer at the Living Center.

On the morning of the incident, Ganske was watching monitors displaying a live feed from some of the Living Center's surveillance cameras. She noticed Vaughn walking around in a circle in the day room. She observed him go in and out of several rooms, and she saw appellant get up "a lot of times." Ganske said she saw appellant and Vaughn leave the day room, with Vaughn walking in front of appellant, and then appellant "kind of shoved" Vaughn into the classroom. She then testified as follows:

Q. What happened next once they entered the classroom?

. . .

A. He had Ben Vaughn walking straight toward the back of the room and he walked—Mr. Crow walked behind him.

Q. Okay. What happened then?

A. He kind of pulled up—he kind of looked back. There wasn't no teachers in the room.

Q. Who was he?

A. Mr. Crow. There wasn't any teachers in the room or other individuals. Mr. Crow picked up his pants kind of and went like this (indicating) to Ben Vaughn.

Q. What happened to Ben?

A. He hit him on the side of his face.

Q. And how did Ben react to that?

A. He kind of fell backwards a little bit. And he was kind of—he was knocked out of view. I couldn't see him anymore—for a few minutes. And then I saw Mr. Crow kind of look up at the monitor knowing that he either got saw or he didn't know if anybody saw him or not. Then he put his arm— Mr. Crow put his arm around Ben Vaughn to walk him out like nothing ever happened.

Ganske testified she "couldn't believe it" and had to watch the incident two or three times. She then called the campus coordinator per the Living Center's protocol and reported what she saw.

Appellant testified he followed Vaughn into the room as part of his supervisory duties. Soon after they entered the room, somebody in the day room (not visible on the video) announced it was snack time, and that announcement led appellant to turn toward the door leading to the day room. He turned back to grab Vaughn's shoulder to take him to get his snack. In the meantime, Vaughn had leaned back and was walking toward the window. Appellant "let him go ahead and lean back," then asked Vaughn to get up so they could go get his snack. Appellant put his right arm around Vaughn because Vaughn likes to be touched and held.

Appellant's wife, Elizabeth Crow, is a relief home leader at the Living Center. She testified that snack time at the Living Center is between 10:00 a.m. and 10:30 a.m. However, she was elsewhere on campus at the time of the incident so she could not be sure when snack time started in the building where the incident occurred.

Mrs. Crow watched State's Exhibit 2 during cross-examination by the State. After watching the video, she testified she would have reported the incident if she had seen it.

## B. After the Incident

Both parties agree that after the incident, Vaughn acted as he typically does. He did not appear agitated or upset.

Tina Guillotte is a licensed vocational nurse at the Living Center. She examined Vaughn shortly after the incident. As is protocol at the Living Center, she was not informed of the specific allegations regarding the incident. Guillotte testified at trial and the client injury report she filled out regarding her examination was admitted into evidence.

Guillotte never heard Vaughn speak during her time at the Living Center, and Vaughn was non-verbal during her examination. She explained, "[T]o ask the direct question is he hurt, there is no acknowledgement from him whether or not he is hurting. To show me where he might be hurt, he doesn't acknowledge that either." Guillotte said Vaughn does not stand still, and usually turns in circles. He moved constantly during the examination, but he was "somewhat calm."

The injury report indicates Guillotte saw three injuries on Vaughn: (1) a scratch with a scab on his head; (2) a red line on the back of his upper left arm; and (3) a bruise on the front of his upper left arm. She estimated the red line as being approximately six centimeters. She described

the bruise as a circular, "yellow/brown discoloration" approximately five centimeters in diameter. At trial, Guillotte said the scab was not fresh. She could not determine how long the bruises had been present on Vaughn's arm because bruises surface at different times. Guillotte explained she can examine only the body parts the resident permits her to, and she did not recall if Vaughn let her examine his body lower than his arm.

Lisa Walker had been Vaughn's psychologist at the Living Center for more than ten years at the time of trial. The Living Center's protocol requires a post-incident psychological assessment (referred to as a "PIPA") to be completed when a resident is alleged to have been abused. The purpose of the PIPA, according to Walker, is "to see if [the resident's] behavior is any different at the onset or if they're dressed differently, their appearance, just an overall view of that person."

Walker completed a PIPA on Vaughn roughly 30 minutes after the incident. Like Guillotte, she did not know the specific allegations of abuse. During the assessment, Vaughn was playing on the floor with blocks. On request, he sat in a chair and played at a table. Walker said Vaughn "didn't pay too much attention to [her] at all."

Following her assessment, Walker filled out a PIPA report indicating she saw no variations from his typical affect, appearance, or behavior. She wrote:

> No new behaviors were present. Psych observed Mr. Vaughn on loveseat at PS working on a puzzle of dinosaurs. He was very focused on getting the last piece entered correctly. His 1:1 staff [Nachelle Martin] stated that he was acting like his usual self. Mr. Vaughn did not have any obvious injury or display any behaviors or expressions that showed discomfort.

Walker confirmed those statements at trial.

On cross-examination, Walker testified that she would not expect Vaughn to exhibit new behaviors or discomfort if he had been recently assaulted:

> Q. With all your 26 years' experience, can you make an assessment of what he would have been like or what someone like Ben might have been like if someone had taken a fist and hit him across the face just 30 minutes prior?
>
> A. I don't know if Ben would present as different from his usual self, to be honest—I mean, with his range of capabilities, he's very limited. And that could have happened, you know, ten minutes before and I don't know if Mr. Vaughn would act much differently, to be honest.

Walker gave an example of Vaughn's limited reaction to discomfort or pain:

> Q. Have you ever seen Ben agitated, in any kind of agitated state?
>
> A. One time he was very sick and his behaviors changed a little bit. He couldn't tell us that he was sick, of course. He couldn't even tell us that his adenoids were—God, they were ginormous and we couldn't tell. But the only thing that he did different is that he wouldn't sit down. So he was just a little bit more hyper and a little bit more—like he was panicky. ... He couldn't sit down. He wasn't comfortable in his own body. That's when we knew something's wrong.

Walker testified that the five people in the room where the incident occurred were residents of the Living Center. Three or four of those residents are profoundly retarded; they have the mental age of a one-year-old child. She knew one of the five residents is deaf. Walker said those resi-

dents do not have the ability to speak or tell anyone what they saw. On cross-examination, Walker said some of them "might have" shown a reaction if they had seen or heard the incident.

The jury found appellant guilty and assessed punishment at two years in prison. This appeal timely followed.

## ANALYSIS

In his sole issue on appeal, appellant asserts the evidence is insufficient to support a finding that Vaughn suffered bodily injury.

### I. Standard of Review

The legal sufficiency standard of review is the only standard we apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App. 2010). When reviewing the legal sufficiency of the evidence, we consider the evidence in the list most favorable to the verdict. In making this review, we consider all evidence in the record, whether it was admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex.Crim.App.2013). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim.App.2015).

The jury is the sole judge of the credibility and weight to be attached to the testimony of witnesses. *Temple v. State*, 390 S.W.3d 341, 360 (Tex.Crim.App.2013). We defer to the jury's responsibility to fairly resolve or reconcile conflicts in the evidence, and we draw all reasonable inferences from the evidence in favor of the verdict. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App.2010). In conducting a sufficiency review, we do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Young v. State*, 358 S.W.3d 790, 801 (Tex.App.— Houston [14th Dist.] 2012, pet. ref'd).

Reconciliation of conflicts in the evidence is within the exclusive province of the fact finder. *See Mosley v. State*, 983 S.W.2d 249, 254 (Tex.Crim.App.1998). The appellate court's duty is not to reweigh the evidence, but to serve as a final due process safeguard ensuring only the rationality of the fact finder. *See Williams v. State*, 937 S.W.2d 479, 483 (Tex.Crim.App.1996). An appellate court faced with a record of facts that supports conflicting inferences must presume—even if not obvious from the record—that the finder of fact resolved any such conflicts in favor of the State, and must defer to that resolution. *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

### II. Bodily Injury

#### A. Governing law

Appellant was charged under section 22.04 of the Texas Penal Code, entitled "Injury to a Child, Elderly Individual, or Disabled Individual." That section provides in relevant part:

> (a-1) A person commits an offense if he is an owner, operator, or employee of a group home, nursing facility, assisted living facility, intermediate care facility for persons with mental retardation, or other institutional care facility and the person intentionally, knowingly, or recklessly, or with criminal negligence by omission causes to a child, elderly individual, or disabled person who is a resident of that group home or facility:
>
> . . .

(3) bodily injury.

Appellant challenges only the sufficiency of the evidence to support a finding that Vaughn suffered bodily injury.

▇▇▇▇▇ Bodily injury means "physical pain, illness, or any impairment of physical condition." Tex. Penal Code Ann. § 1.07(8). This definition encompasses even relatively minor physical contact if it constitutes more than offensive touching. *Laster v. State*, 275 S.W.3d 512, 524 (Tex.Crim.App. 2009). Any physical pain, however minor, will suffice to establish bodily injury. *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim.App.2012). A fact finder may infer that a victim actually felt or suffered physical pain because people of common intelligence understand pain and some of the natural causes of it. *Id.* at 688.

## B. Application

▇▇▇ The jury saw a video recording of the incident. From that video, the jury reasonably could find that appellant used his fist to punch Vaughn on the left side of his head. Diane Ganske saw the incident as it occurred, and the jury heard her testimony that she saw appellant hit Vaughn.

Based on the contact shown via video and described in testimony, the jury reasonably could have concluded Vaughn received a blow to his head sufficient to cause physical pain constituting bodily injury. *See Contreras v. State*, 54 S.W.3d 898, 903–04 (Tex.App.—Corpus Christi 2001, no pet.) (testimony from witness who saw defendant punch a non-verbal child was sufficient evidence of pain needed to establish bodily injury), *abrogated on other grounds as stated in Jennings v. State*, 302 S.W.3d 306 (Tex.Crim.App.2010); *Wawrykow v. State*, 866 S.W.2d 87, 89 (Tex.App.—Beaumont 1993, no pet.) (absent direct evidence that complainant suffered pain when defendant pushed him in the chest, jury could infer that complainant

felt pain based on testimony that the defendant "gave him a pretty good push" and a demonstration of what happened); *Gravelle v. State*, No. 07–02–00510–CR, 2003 WL 22213578, *2 (Tex.App.—Amarillo Sept. 25, 2003, no pet.) (not designated for publication) (jury reasonably could have found inmate intentionally or knowingly caused bodily injury to prison guard based on evidence that appellant, among other things, doubled his fists, jerked away from guard, and placed guard in headlock); *Feldpausch v. State*, No. 09–02–00299–CR, 2003 WL 253373, *1–2 (Tex.App.—Beaumont Feb. 5, 2003, pet. ref'd) (per curiam) (not designated for publication) (jury reasonably could have found bodily injury given evidence that defendant swung at complainant with a closed fist and complainant fell to the ground.); *Zuliani v. State*, 52 S.W.3d 825, 831 (Tex.App.—Austin 2001) ("The threshold for 'bodily injury'—physical pain—is low; no rational jury could believe the evidence that Dwinell slapped him, hit him, or pushed him down without also finding that she caused him at least physical pain."), *overruled on other grounds*, 97 S.W.3d 589 (Tex.Crim.App. 2003). The jury reasonably could have inferred that appellant's punch caused Vaughn physical pain because "people of common intelligence understand pain and some of the natural causes of it." *Garcia*, 367 S.W.3d at 688.

Lisa Walker, Vaughn's long-time psychologist, testified that even if Vaughn was hit very recently, she would not be surprised if he did not indicate pain or discomfort. She said even when his adenoids were very swollen, the only indication of his discomfort was that he would not sit down. The jury could have considered that testimony in assessing whether the blow delivered by appellant was sufficient to cause pain constituting bodily injury even if Vaughn's severe disabilities prevented

him from verbalizing a complaint about pain.

Sufficient evidence supports the finding that appellant caused Vaughn bodily injury. We overrule appellant's sole issue.

## MODIFICATION OF JUDGMENT

The trial court's judgment identifies the statute for the offense as section 22.04(1)(C)(2)(a) of the Penal Code. That portion of the judgment is incorrect because no such section existed at the time appellant was convicted.

The indictment alleges appellant was an employee of a group home and intentionally or knowingly caused bodily injury to Vaughn, a disabled individual who resided in the group home. The jury charge states, "A person commits an offense if the person is an employee of a group home and the person knowingly or intentionally, by act, causes to a disabled individual, who is a resident of that group home, bodily injury." Both the indictment and the jury charge track the language of section 22.04(a–1)(3) of the Penal Code, which states in relevant part:

(a-1) A person commits an offense if the person is an ... employee of a group home ... and the person intentionally, knowingly, recklessly, or with criminal negligence by omission causes to a ... disabled individual who is a resident of that group home or facility:

. . .

(3) bodily injury.

Tex. Penal Code Ann. § 22.04(a–1)(3) (West 2011). Therefore, the correct statute under which appellant was convicted is section 22.04(a–1)(3).

▮▮▮▮ A court of appeals may modify the trial court's judgment and affirm it as modified. Tex. R. App. P. 42.3(b). The reviewing court has authority to reform the trial court's judgment to make it speak the truth. *See French v. State*, 830 S.W.2d 607, 609 (Tex.Crim.App.1992). Accordingly, we modify the trial court's judgment to identify the statute for the offense as section 22.04(a–1)(3) of the Penal Code.

## CONCLUSION

We modify the trial court's judgment and affirm the judgment as modified.

Martha Hill Jamison, Justice, dissenting

Because the record does not support the majority's conclusion that there is legally sufficient evidence to support the jury's finding that the complainant, Benjamin Vaughn, suffered bodily injury, I respectfully dissent. The only evidence presented at trial of the incident was a video with no audio and testimony from a security officer who viewed the encounter live on a monitor. It is not clear from the video that appellant did more than shove Vaughn's left hand away from his ear. Vaughn then steps out of the frame.[1]

I agree with the majority that evidence of "[a]ny physical pain" will establish bodily injury. *See Garcia v. State*, 367 S.W.3d 683, 688 (Tex.Crim.App.2012). But there must be evidence of *some degree* of physical pain and not just offensive touching. *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim.App.2009). In the *Garcia* case, the Court of Criminal Appeals concluded that "[a]lthough there [was] evidence that the [complainant] child was shivering, had blue lips, and wore only a wet diaper, no evidence shows that she was experiencing physical pain." 367 S.W.3d at 688. However, the majority holds that the jury reason-

---

1. The majority posits that Vaughn "fell" out of frame. The video does not show that

Vaughn fell.

ably could have concluded that Vaughn "received a blow to his head sufficient to cause physical pain" when the video is not that transparent. Here, the only witness was a security officer who observed the live monitor with no audio, the video of which was presented to the jury. The majority has failed to cite a case holding that legally sufficient evidence supported a finding of bodily injury based on evidence this scant.[2]

The majority further concludes that the jury reasonably could infer that Vaughn suffered bodily injury because his psychologist testified that he does not always indicate when he feels pain. However, Vaughn's *failure to indicate* that he felt pain is not evidence beyond a reasonable doubt that he felt pain.[3] Inferences must be reasonably supported by the evidence. *See Riley v. State*, No. 14–12–00729–CR, 2014 WL 1481317, at *1 (Tex.App.—Houston [14th Dist.] Apr. 15, 2014, pet. ref'd) ("We draw all reasonable inferences from the evidence in favor of the verdict.").

The parties agree that, after the incident, Vaughn acted as he typically does, which is not evidence beyond a reasonable doubt that he felt pain from the incident. The nurse who examined Vaughn soon after the incident testified that an injury can cause pain without leaving a visible mark. However, the absence of visible marks on Vaughn's body attributable to a fresh injury, as reflected in the nurse's report and her testimony, is not evidence beyond a reasonable doubt that Vaughn felt pain from a fresh injury.

It is clear that the Legislature intended to protect our most vulnerable citizens in enacting Penal Code section 22.04. However, based on this record, I cannot join the majority's conclusion that there is evidence from which a reasonable jury could infer beyond a reasonable doubt that this disabled individual suffered any degree of physical pain and thus incurred bodily injury. *Garcia*, 367 S.W.3d at 688. I would conclude that the jury's finding of bodily injury is not supported by legally sufficient evidence.

2. None of the cases cited by the majority involved as little information as was presented to the jury here. *See Gravelle v. State*, No. 07–02–0510–CR, 2003 WL 22213578, at *2 (Tex.App.—Amarillo Sept. 25, 2003, no pet.) (mem. op.) (defendant caused bruise or abrasion near complainant's eye); *Feldpausch v. State*, No. 09–02–299–CR, 2003 WL 253373, at *2 (Tex.App.—Beaumont Feb. 5, 2003, pet. ref'd) (mem. op.) (defendant fell down and suffered a bruise on the arm); *Contreras v. State*, 54 S.W.3d 898, 903–04 (Tex.App.—Corpus Christi 2001, no pet.) (witness saw defendant "strike [the complainant's] face with her fist" and three-year old child complainant "cried 'a little bit'"), *abrogated on other grounds as stated in Jennings v. State*, 302 S.W.3d 306 (Tex.Crim.App.2010); *Zuliani v. State*, 52 S.W.3d 825, 831 (Tex.App.—Austin 2001) (defendant allegedly slapped complainant twice), *overruled on other grounds*, 97 S.W.3d 589 (Tex.Crim.App.2003); *Wawrykow v. State*, 866 S.W.2d 87, 90 (Tex.App.—Beaumont 1993, no pet.) (officer testified that defendant "gave me a pretty good push" and demonstrated for jury so jury could determine whether he suffered bodily injury). Here, the only evidence before the jury about the incident was an ambiguous video and testimony based solely on that video.

3. Likewise, the psychologist's testimony that she was not surprised that the five potential witnesses, all disabled individuals, failed to react to the incident is not evidence of an essential element of the offense.