**Affirmed and Memorandum Opinion filed August 7, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-00879-CR
### NO. 14-12-00880-CR

---

## MACIEL DELOSANGELES SANDOVAL, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Cause Nos. 1309686 & 1357622**

---

## M E M O R A N D U M   O P I N I O N

Appellant Maciel Delosangeles Sandoval appeals her convictions for felony murder and intentionally or knowingly causing serious bodily injury to a child. On appeal, appellant contends the evidence at trial was legally insufficient to prove either offense, and that she was denied effective assistance of counsel in violation of her rights under the United States and Texas Constitutions. We hold the evidence was sufficient to prove appellant committed the offense of injury to a

child by failure to protect the complainant, and was sufficient to prove appellant was a party to felony murder based on her disregard of her legal duty to act. We also hold, on the record before us which is silent as to her counsel's strategy, that appellant has not shown a reasonable probability that her counsel's representation fell below an objective standard of reasonableness, or that there is a reasonable probability that the result of the proceeding would have been different but for the alleged deficiency. We therefore affirm.

## BACKGROUND

In 2009, appellant began a romantic relationship with Elida "Judith" Herrera. Judith and her son Eric moved into the apartment occupied by appellant and her daughter, the complainant. Appellant decided that Judith would take over caring for the complainant, which had previously been her sister Silvia's responsibility.

On June 3, 2011, Houston firefighters met appellant and Judith at their shared apartment in response to appellant's emergency call that the complainant was not breathing. By the time the firefighters arrived, the four-year-old complainant was lying motionless and without a pulse on the floor. One of the responding firefighters testified the complainant was "cool to the touch." The firefighters began performing CPR on the complainant and transported her to the hospital. Resuscitation efforts were unsuccessful and the complainant was declared dead at the hospital.

In the two years between the emergency call and Judith's joining appellant's household, a number of people, ranging from close relatives to medical professionals, expressed concerns to appellant that the complainant was being mistreated. More than one heated argument with appellant arose out of these concerns. The people and entities who raised concerns directly with appellant as to

2

the complainant's treatment included her sister Juana, Juana's husband Angel, Laura (a friend of the couple who sometimes stayed at their home), and Child Protective Services.

Others began expressing concern to appellant about mistreatment and neglect of the complainant as early as 2010, when a nurse who was treating the complainant for an injury informed appellant she would be making a report to Child Protective Services.[1] Appellant had brought the complainant to the hospital to get an X-ray and stitches for an ear wound appellant claimed was from falling off of a scooter earlier that day. The nurse testified that the complainant also had what appeared to be older bruises on her right side that were inconsistent with a scooter fall that same day. Appellant told the nurse the bruises were from a fall the week before.

Approximately two weeks later, the complainant needed a second set of stitches for a laceration on her chin. Because she had an open case with Child Protective Services at this point, appellant asked her sister Juana to take the complainant for medical treatment. Juana, who had not seen the complainant in the past year, was shocked by her thin appearance. Appellant told Juana that the complainant had fallen while playing in the park. Appellant told Juana to take the complainant to a clinic, and not her usual hospital, because of appellant's ongoing case with Child Protective Services.

Appellant's sister Silvia lived with Judith and appellant briefly in 2009 and observed Judith disciplining the complainant on multiple occasions, including by holding her against a wall and beating her with a belt or by locking her in a room. Gloria and Silvia noticed that the complainant became extremely skinny after

---

[1] Child Protective Services also received at least two other reports of suspected child abuse or neglect regarding the complainant, one of which was procured by appellant's siblings.

3

Judith moved in, and her personality changed drastically from bubbly to quiet. When Gloria tried to engage the complainant by asking her questions in Judith's presence, the complainant stared at Judith and would not answer. The complainant told her aunts that her mother and Judith were "mean to her," and that she was afraid of Judith, who beat her a lot.

Appellant's siblings became concerned that the complainant had an excessive number of injuries for which appellant offered unsatisfying explanations. Gloria noticed a brown bruise around the complainant's eye in October 2010, and Juana saw a purple bruise around her eye in November 2010. In response to Gloria's and Juana's questions regarding complainant's black eyes, appellant claimed the complainant was very clumsy and fell frequently. Appellant's sister Gloria asked both appellant and the complainant about burns she noticed on the backs of the complainant's hands. Gloria observed Judith staring at the complainant as if warning her not to say anything. Appellant told Gloria the complainant had pulled on a television cord, which electrocuted her. Appellant claimed she had heard the complainant scream and reached for her, but the cord had already burned the complainant's hands. Two of appellant's sisters testified that the burns appeared only on the backs of the complainant's hands not the palms, and that the explanation did not make sense to them at the time.

Appellant's sister Juana and her husband Angel lived with Judith and appellant in early 2011. Angel explained that Juana made the decision to move into the apartment because she wanted to see what was going on with the complainant. Juana and Angel testified that they observed several bruises on the complainant's body, and Angel noted that the complainant had been left in a dark room alone with the door locked. Juana testified that the complainant's demeanor changed when Judith would walk into the room.

4

When Juana expressed concern to appellant about the complainant's bruises and injuries and offered to take care of the complainant, appellant explained that the complainant was clumsy and said she would have to discuss the offer with Judith. Juana had not seen the complainant being clumsy. Later that evening, appellant spoke to Judith about the complainant's treatment. A violent altercation ensued that ended with Judith leaving the apartment for the evening. Judith came back the next day, and appellant continued to allow her to care for the complainant. When Angel told appellant that the way she and Judith were treating the complainant was wrong, appellant accused Angel of hitting her and called the police. Juana and Angel, who testified appellant's accusation was false, promptly moved out of the apartment.

Appellants' siblings grew so concerned that they met without the appellant present and resolved to have a neighbor make a complaint to Child Protective Services. They later advised the complainant's father to check on the complainant, and he also spoke with Child Protective Services. The siblings did not hear anything further about the complaint until after the complainant was pronounced dead on June 3, 2011. In the four days leading up to the complainant's death, however, appellant called a caseworker at Child Protective Services five times, including two calls on the day of the complainant's death. Appellant did not report any suspected child abuse or neglect during these phone calls. Appellant later told an investigating officer that she made the phone calls in an attempt to find out if her case with Child Protective Services had been closed.

The firefighters who responded to appellant's emergency call on June 3 were unaware of appellant's interactions with Child Protective Services, and appellant did not mention either her phone calls or the previous investigation to them. The firefighters removed the complainant's clothing as part of their initial assessment,

5

and noticed bruising all over the complainant's body and on her face. The firefighters also noticed a laceration on the complainant's chin. Appellant told one of the firefighters that the complainant cut herself earlier that morning when she fell off of the toilet. Neither appellant nor Judith responded when the officers asked how the complainant received the bruises all over her body, however. Dr. Adam Rusher attempted to resuscitate the complainant at the hospital and testified that immediately upon her arrival at the hospital, her bruises were "very apparent."

An investigation followed the complainant's death, in the course of which appellant gave two interviews to Roy Swainson, an officer in the City of Houston Police Department's homicide division. Appellant offered explanations for some of the complainant's injuries, including falling off the toilet and hitting the sink, failing off of a scooter, falling off of an ottoman, falling at the beach, scratching herself, and wearing sandals that were too tight. Officer Swainson felt that these explanations were insufficient to explain all of the complainant's injuries, but appellant insisted the complainant was an excessively clumsy child and that she did not know where the other bruises came from.

Despite claiming that she bathed the complainant at least every other day, appellant claimed she had not seen some of the bruises appearing on the complainant in pictures taken after her death. Dr. Albert Chu performed the complainant's autopsy, which revealed several injuries including twenty-one scalp and facial contusions, bleeding on the surface of her brain, a bruised cerebellum, more than twenty bruises or contusions to her torso, bruises on her sacral region, buttocks, and extremities, extensive damage to the tissues underneath the skin,[2] a contusion or bruise of the small intestine as well as the mesentery, fractures in each

---

[2] Dr. Chu testified that the complainant had multiple avulsion pockets—"tearing of the connected tissue underneath the skin with associated bleeding and liquefying of soft tissue"— underneath the bruises in her sacral region, buttocks, and extremities.

shoulder blade, and a fracture to the humerus in her left arm. Several of these injuries were judged to be a minimum of three days old based on the inflammatory response within the cell samples taken from the areas.[3]

The autopsy also revealed the complainant had an accumulation of fat emboli in the blood vessels in her lungs. According to evidence introduced at trial, fat emboli form when tissues and structures with fat—such as a long bone or the fat beneath the skin—suffer significant injury. Fat emboli collect in the blood stream, and the blood, needing oxygen, eventually carries the fat emboli to the lungs. If enough fat emboli are present in the blood stream, it can cause blockages in the vessels in the lungs, interfering with the flow of blood into the lungs and the lungs' ability to oxygenate the blood. The complainant had blockages from fat emboli in all lobes of her lungs. Based on the lack of an inflammatory reaction to the presence of the emboli in the lungs, the emboli were judged to have traveled to the lungs within hours of her death. Medical testimony suggested the onset of death would have been "relatively sudden" once the blood was unable to get into the lungs because of the blockages.

According to Judith, approximately thirty minutes before the firefighters arrived, she saw the complainant alive prior to taking a shower. She told the emergency responders she exited the shower to see the complainant's body shaking on the ground. According to appellant, Judith called her while she was at work to tell her that the complainant was dying, and appellant rushed home.[4] According to appellant, the complainant was not breathing when she arrived home, and she

---

[3]Dr. Chu testified that most of the bruising on the complainant's head and the contusions extending from her chest to her arms fell within this age range. Dr. Chu testified it was also possible that someone had assaulted the already-bruised complainant an hour before she died.

[4] The investigating officer confirmed with appellant's employer that she reported to work on the day of the complainant's death, but the record does not reveal whether the officer confirmed at what time appellant left work.

immediately called 911.

Appellant was indicted and charged with felony murder as well as the felony of knowing or intentional injury to a child by omission. Appellant's trial counsel did not request a jury instruction on the lesser-included offense of reckless injury to a child. Appellant's trial counsel also did not object to or request jury instructions on testimony from appellant's sister Juana that she once saw appellant strike the complainant with a belt repeatedly for refusing to eat. The jury found appellant guilty of both offenses.

## ANALYSIS

Appellant raises two issues on appeal, contending (1) evidence at trial was insufficient to support her two convictions, and (2) she did not receive effective assistance of counsel at trial. We address each issue in turn.

## I. Sufficient evidence supports appellant's convictions.

In her first issue, appellant argues that the evidence presented at trial is legally insufficient to support her convictions. We hold the evidence was sufficient and overrule appellant's first issue.

### A. Standard of review

We resolve legal sufficiency challenges by considering all of the evidence in the light most favorable to the verdict, and determining whether a rational jury could find each element of the offense beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). The essential elements of an offense are defined by the "hypothetically correct jury charge." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).[5] The jury is the sole judge of the

_____

[5] The hypothetically correct jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular

credibility of witnesses and the weight to give testimony, and our role on appeal is simply to ensure that the evidence reasonably supports the jury's verdict. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

Where intent is an element of the offense, the lack of direct evidence as to intent does not render the evidence legally insufficient. *See Hart v. State,* 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Instead, the required culpable mental state may be inferred from the surrounding circumstances. *Ledesma v. State,* 677 S.W.2d 529, 531 (Tex. Crim. App. 1984). The jury may infer intent from circumstantial evidence, such as the acts, words, and conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

> **B.** **There is sufficient evidence that appellant intentionally or knowingly injured the complainant by omission.**

A person commits the offense of injury to a child if he "intentionally, knowingly, or recklessly by omission" causes serious bodily injury[6] to a child for whom she has assumed care, custody, or control. Tex. Penal Code Ann. § 22.04 (West Supp. 2013); *Alvarado v. State*, 704 S.W.2d 36, 38–39 (Tex. Crim. App. 1985). The State was required to prove that appellant either intended or "was aware with reasonable certainty that serious bodily injury to the [complainant] would result from her omissions." *Patterson v. State*, 46 S.W.3d 294, 302 (Tex. App.—Fort Worth 2001, no pet.).

The indictment and the jury charge included three theories by which appellant could be found guilty of intentionally or knowingly causing serious bodily injury to a child by omission: (1) by failing to seek medical attention for the

---

offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

[6] "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Tex. Penal Code § 1.07(a)(46) (West 2011).

9

complainant in a timely manner; (2) by failing to protect the complainant; or (3) by failing to adequately nourish the complainant. We hold the evidence was sufficient to support appellant's conviction for failing to protect the complainant, and therefore do not reach the sufficiency of the evidence regarding the State's alternative theories.

Appellant concedes that she knew Judith often disciplined the complainant, but suggests that "there is nothing in the record to suggest that appellant knew . . . that Judith was causing the complainant serious bodily injury . . . ." To the contrary, there is evidence that (1) appellant was aware the complainant had sustained several injuries over time; (2) those injuries were not sustained accidentally; and (3) some of the injuries, or the combination of injuries, were serious. Viewed together, this evidence supports an inference that appellant was aware with reasonable certainty that failing to protect the complainant—by removing her from those who were supervising her when the injuries occurred—would continue to result in serious bodily injury to the complainant.

The State presented sufficient evidence for a rational jury to determine beyond a reasonable doubt that the complainant's injuries were the result of abuse and not accident. The jury heard expert testimony that "normal handling" would not cause the injuries to complainant's bones and that "multiple injuries of different ages affecting different bones" such as the complainant's are "inconsistent with accidental injury." *Cf. Morales v. State*, 828 S.W.2d 261, 265 (Tex. App.—Amarillo 1992), *aff'd*, 853 S.W.2d 583 (Tex. Crim App. 1993) (holding jury could rely on "medical evidence that 'several slammings,' and 'significant force,' as well as a 'great deal of force,' was required to produce the child's severe injuries" to infer intent to cause child serious bodily injury).

On appeal, appellant contends nothing in the record proves her awareness of

such abuse, relying on appellant's "numerous explanations for the complainant's injuries, citing to specific events where the child hurt herself." The State was not required to disprove the possibility of an innocent explanation for each and every injury, nor was the jury bound to accept that the mother offered these explanations to others solely because she believed in them, and not because she wanted to evade discovery and interference for her or Judith's sake. Given the testimony of numerous witnesses that they expressed concerns to appellant about the complainant's treatment and that the bruising on the complainant was immediately apparent, as well as the photographs in evidence, the jury could reasonably conclude appellant knew the complainant's injuries were not the result of mere falls and thus someone was abusing the complainant. *See Dusek v. State*, 978 S.W.2d 129, 134 (Tex. App.—Austin 1998, pet. ref'd) (holding jury could rationally conclude mother of son whose body was covered by many large bruises of varying ages knew her boyfriend was physically abusing her son). Furthermore, appellant claimed that when she arrived home, the complainant was lying on the floor with no clothes, but that one of the two women dressed the complainant before the ambulance arrived.[7] The jury could rationally conclude that the couple wanted to dress the complainant because the bruises were so apparent and suggestive of abuse.

Even if appellant never personally witnessed Judith or anyone else seriously injuring the complainant, each significant injury the complainant collected in her relatively short life made belief in an innocent explanation less and less reasonable. *Cf. Garza v. State*, 632 S.W.2d 823, 825 (Tex. App.—Dallas 1982), *rev'd on other grounds*, 715 S.W.2d 642 (Tex. 1986) ("Each successive occurrence tends

---

[7] Appellant initially told Officer Swainson she remembered dressing the nonresponsive complainant herself while awaiting the ambulance, but then said it was Judith who had dressed the complainant.

increasingly to negative an innocent explanation."). Although appellant offered statements attributing those injuries to accidental causes, a rational jury could have determined that her belief in those explanations crossed the line between unreasonable and incredible, particularly in light of the number of people and entities—even strangers—who expressed suspicion to the contrary, as well as appellant's deliberate avoidance of Child Protective Services. The jury could infer beyond a reasonable doubt that the abusive mistreatment of the complainant was more than a disregarded risk, but rather a known fact within appellant's household.[8]

A rational jury could also have determined that the accumulation of the complainant's injuries, which medical testimony established was not the result of one episode, was such that anyone lacking the conscious objective or desire for the complainant to suffer serious bodily harm would have intervened. *See Galvan v. State*, 699 S.W.2d 663, 671 (Tex. App.—Austin 1985, pet. ref'd) (holding State presented sufficient evidence that "no person could have allowed [the complainant] to reach the deteriorated physical condition that he was in at the time of his death without having the conscious objective or desire to do so"). The complainant was covered in bruises at the time of her death. There was testimony that the bone fractures, as well as other injuries, would have caused the child pain even from regular contact such as hugging.[9] *Cf. Hill v. State*, 883 S.W.2d 765, 770 (Tex. App.—Amarillo 1994, pet. ref'd) ("Although [the party disciplining the

---

[8] Appellant's own closing arguments undermined the credibility of her belief in the innocent explanations for the complainant's injuries. Appellant's trial counsel referred to appellant as a "battered woman," a characterization that suggests appellant was more than aware her partner was abusive.

[9] Although appellant attempted to elicit testimony that if the complainant had an abnormal pain threshold perhaps nobody would notice that she was in pain, there was also testimony that a school clerk noticed bruises on the complainant and felt the complainant wince as she hugged her.

complainant] said he did not realize he had injured [the complainant] that badly, the jury, as the judge of the credibility of the witnesses and the weight to be given their testimony, was free to reject [his] belated and self-serving attempt to conceal his intent." (internal citation omitted)).

The jury could also infer that appellant knew with a reasonable degree of certainty that not removing the complainant from Judith's care would result in the further accumulation of injuries. *Cf. Payton v. State*, 106 S.W.3d 326, 331 (Tex. App.—Fort Worth 2003, pet. ref'd) (holding evidence was sufficient where there was testimony that it was "obvious [the abuser's] behavior was an ongoing problem, and appellant had done nothing about it"). Unlike *Dusek v. State*, in which there was no evidence the appellant's boyfriend had ever seriously injured her son before, the jury in this case heard expert testimony that the complainant had her bones broken more than once. Dr. Jennifer Love testified at trial that based upon the bone fractures' various states of healing, the complainant suffered "a minimum of three traumatic episodes" and possibly more if the scapula fractures on each side did not occur simultaneously. According to Dr. Love, the complainant's first humerus fracture likely occurred two weeks before her second, and the scapula fractures likely occurred much closer to death. Dr. Love's testimony established that serious bodily injury was not an isolated incident but was occurring frequently enough that the complainant's body did not have time to finish healing prior fractures before being reinjured.

Judith's access to the complainant was solely the result of her relationship with appellant. But rather than cut off Judith's access, which appellant claimed she offered the complainant,[10] appellant facilitated the abuse by offering explanations

---

[10] Appellant told Officer Swainson that she had asked the complainant whether she would rather that the two of them get their own apartment again, but that the complainant wanted them all to continue living together as a family.

13

that were designed to mislead those attempting to assist the complainant, and by actively evading the involvement of Child Protective Services. *Cf. Young v. State*, 358 S.W.3d 790, 802 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) ("By consciously choosing to lie about [the abuser's] access to [the complainant], appellant exposed her to further abuse and thwarted efforts to investigate the real cause of [the complainant's] injuries."); *Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1999, pet. ref'd) ("The jury could have reasonably concluded that [appellant] lied to [the investigator] because he had something to hide."). Even after the complainant's death, appellant continued to conceal any abuse, putting clothes on the complainant[11] and telling Officer Swainson that Judith spoiled the complainant, and the complainant always wanted to be with Judith.

We hold the jury heard sufficient evidence to infer that appellant knew with reasonable certainty that the abuse would continue if she did not protect the complainant. We therefore overrule appellant's first issue as to her conviction of injury to a child.

### C. There is sufficient evidence that appellant was a party to felony murder.

Appellant also contends the evidence was insufficient to convict her of felony murder as either a principal or a party. We disagree and conclude that the evidence was sufficient to convict appellant as a party based on her legal duty to protect the complainant.

---

[11] Although appellant made conflicting statements to Officer Swainson regarding which of the women chose to dress the complainant in clothes that would cover her many injuries, we presume the jury resolved such conflicts in the light most favorable to the verdict. *Cf. Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (holding evidence may be sufficient under an assumption that a jury believed a portion of but not the entirety of a witness's testimony).

A person commits the offense of felony murder if he commits "an act clearly dangerous to human life that causes the death of an individual" in the course of and in furtherance of the commission of a felony other than manslaughter. Tex. Penal Code Ann. § 19.02(b)(3) (West 2011). A person is criminally responsible for an offense committed by the conduct of another if, "having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense." Tex. Penal Code § 7.02(a)(3) (West 2011). "The penal code does not require that a party to the crime be physically present at the commission of the offense." *Guevara*, 152 S.W.3d at 52.

The jury was authorized to convict appellant of felony murder if it found (1) one of the two women caused the complainant's death by intentionally or knowingly striking her with either a belt, a hand, or an unknown object;[12] and (2) appellant either struck the complainant herself, or was criminally responsible for Judith's striking the complainant.[13] The charge included two theories under which appellant could be criminally responsible for Judith's striking the complainant. Under the aiding theory, appellant would be guilty if, acting with the intent to

---

[12] The charge instructed the jury that any one of the three would constitute the felony of injury to a child.

[13] Although the application portion of the charge submitted to the jury restricted them to considering appellant's guilt as a party under the theory that Judith was the principal, a hypothetically correct jury charge neither "unnecessarily increase[s] the State's burden of proof or unnecessarily restrict[s] the State's theories of liability." *Malik*, 953 S.W.2d at 240. We note that although some evidence was presented at trial that Judith's son, Eric, had previously been violent with others, neither side introduced evidence or made arguments suggesting Eric may have harmed the complainant. In her statement to Officer Swainson, appellant adamantly denied that Eric had ever hurt her daughter or even had unsupervised access to the complainant, and Officer Swainson testified that he found no evidence to the contrary in the course of his investigation. Because appellant has not raised the issue on appeal, we need not consider whether Judith and appellant were the only potential abusers, or whether the hypothetically correct jury charge would include other potential abusers as part of its application section on appellant's liability as a party.

15

promote or assist the commission of the offense, she "solicited, encouraged, directed, aided or attempted to aid" Judith in striking the complainant. Under the legal-duty theory, appellant would be guilty as a party if she had a legal duty to prevent Judith from striking the complainant but, acting with the intent to promote or assist the offense, failed to make a reasonable effort to prevent commission of the offense. *See* Tex. Penal Code Ann. § 7.02(a)(2)–(3). Appellant does not separately address the sufficiency of the evidence on the legal-duty theory in her brief, focusing instead on the aiding theory. Because we conclude the evidence is sufficient to convict appellant on the legal-duty theory, we address only her arguments that could apply to that theory. *See Carson v. State*, 422 S.W.3d 733, 741–42 (Tex. App.—Texarkana 2013, pet. ref'd) (holding not necessary to prove aiding under legal-duty theory); *Pumphrey v. State*, No. 05-06-00726-CR, 2007 WL 2052159, at *3 (Tex. App.—Dallas July 19, 2007, pet. ref'd) (mem. op., not designated for publication).

Appellant does not dispute that she had a legal duty and concedes that expert testimony established that the complainant died of complications due to blunt force trauma. She contends, however, that the evidence was insufficient to convict her either of striking the complainant herself, or of being criminally responsible for the striking of the complainant. Appellant's primary basis for this contention is that (1) she was not at home when the complainant died or in the hours prior to death, and (2) Dr. Edwina Popik testified that the injury that caused the complainant's death would have occurred only hours before the death because fat emboli are very acute.

Not only was the jury not required to believe appellant's statement that the complainant was already dead or in distress when she arrived home,[14] *see*

---

[14] Conflicting evidence was presented on this question. During appellant's cross-

*Montgomery*, 369 S.W.3d at 192, but appellant's argument overstates Dr. Popik's testimony. The State's expert testified that the fat emboli "would have gotten [to the lungs] within hours of death" in response to a question regarding "how long the fat emboli had been *in* her lungs in relationship to the time she died" (emphasis added). This testimony does not establish that the fat emboli had to be formed within hours of the complainant's death, or that the injuries causing the emboli would have occurred within hours of the complainant's death. There was autopsy evidence from Dr. Chu that most of the bruising on the complainant's head and the contusions extending from her chest to her arms were a minimum of three days old.

Moreover, the State charged appellant with having a legal duty to prevent Judith from striking the complainant and failing to make a reasonable effort to prevent her from doing so. Even if Judith struck the complainant while appellant was not home, appellant's absence at that particular time does not answer the question whether appellant made reasonable efforts to prevent Judith from striking the complainant when she was not home. *See Guevara*, 152 S.W.3d at 52 (holding physical presence during commission of offense is unnecessary for party liability).

Appellant also appears to challenge the sufficiency of the evidence that she acted with intent to promote or assist the commission of the offense. As discussed in the previous section, however, Judith's unsupervised access to the complainant was solely the result of appellant's continuing to allow her that access. The evidence established that appellant declined to have her sister take care of the complainant instead of Judith, even after others began raising concerns about the

---

examination of Officer Swainson, Officer Swainson agreed with defense counsel that appellant was at work at the time her daughter was found deceased in her apartment. One of the responding firefighters testified, however, that both women were in the apartment when he arrived and that appellant made the emergency call from her home.

17

complainant's treatment and obvious injuries. The evidence also established that appellant avoided Child Protective Services when they were investigating claims of mistreatment and made excuses for the complainant's injuries that medical experts and family members attempting to assist the complainant considered implausible in light of the number, extent, and frequency of injuries.

Appellant's suddenly urgent desire to discover if Child Protective Services had concluded its investigation—a desire that arose within days of the complainant dying due to complications from blunt force trauma—could suggest to a rational jury that appellant was not only aware of the trauma but willing to postpone its treatment until suspicions of mistreatment had subsided. *Cf. Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (holding defendant's participation as a party may be based "on actions of the defendant which show an understanding and common design to do the prohibited act"). Furthermore, a rational jury could reasonably infer from evidence of complainant's previous untreated fractures that appellant had a history of subordinating the complainant's need for medical treatment to her desire to perpetuate the living arrangements of the household. A rational jury could conclude that these actions promoted continuing abuse. *Cf. Young*, 358 S.W.3d at 802; *Pumphrey*, 2007 WL 2052159, at *3. We hold there was sufficient evidence for a rational jury to find that appellant, acting with intent to promote or assist the commission of the offense, did not make reasonable efforts to prevent Judith from striking the complainant. We therefore overrule the remainder of appellant's first issue challenging her conviction of felony murder.

## II.   On this record, appellant has not shown ineffective assistance of counsel.

In her second issue, appellant contends she received ineffective assistance of counsel because (1) her trial counsel failed to request that the jury be instructed on

18

the lesser-included offense of reckless injury to a child by omission; and (2) testimony was introduced that appellant once struck the complainant with a belt but trial counsel did not object under Texas Rule of Evidence 403 or request burden-of-proof or limiting instructions regarding that evidence.

## A.      Standard of review and applicable law

The United States and Texas Constitutions guarantee a criminal defendant the effective assistance of counsel. U.S. Const. Amend. VI; Tex. Const. art. I, § 10. Under the standard announced by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668 (1984),[15] an appellant must show both "deficient performance of trial counsel and harm resulting from that deficiency that is sufficient to undermine the confidence in the outcome of the trial" by a preponderance of the evidence. *Ex parte Moore*, 395 S.W.3d 152, 157 (Tex. Crim. App. 2013). Failure to make either showing defeats the ineffectiveness claim. *See id.*

Our review of the reasonableness of trial counsel's conduct is highly deferential. *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). We view the conduct in its context at the time, and apply a "strong presumption" that counsel's conduct "falls within a wide range of reasonable professional assistance." *Id.* "[I]n almost all cases," direct appeal is an inadequate vehicle for raising an ineffective assistance claim because the record is generally underdeveloped. *Id.* at 102; *see also Massaro v. United States*, 538 U.S. 500, 504–05 (2003). Ordinarily, counsel should have an opportunity to explain his or her actions before being held ineffective. *Rylander v. State*, 101 S.W.3d 107, 111

---

[15] In *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986), the Court of Criminal Appeals adopted *Strickland*'s two prong test for both Constitutions' guarantees of effective counsel.

19

(Tex. Crim. App. 2003).

In this case, the record is silent on trial counsel's reasoning for failing to take the actions identified by appellant because appellant did not file a motion for new trial. Accordingly, we may not hold counsel's performance deficient unless "the challenged conduct was so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (internal quotation marks omitted). More specifically, it must be apparent from the record "that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011).

Even if the appellant overcomes the presumption of reasonableness, she must also prove that she was prejudiced by her counsel's actions. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Appellant must show that "'there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Ex parte Martinez,* 330 S.W.3d 891, 901 (Tex. Crim. App. 2011) (quoting *Strickland*, 466 U.S. at 695).

**B.     The record does not show appellant's counsel was deficient in failing to request an instruction on a lesser-included offense.**

We need not determine whether appellant was entitled to the instruction on a lesser-included offense, because the Court of Criminal Appeals has previously upheld the failure to request a lesser-included offense as reasonable where the defendant desired "an all-or-nothing trial strategy." *Ex Parte White*, 160 S.W.3d 46, 55 (Tex. Crim. App. 2004). As such, the challenge to counsel's effectiveness does not present the "rare case" where no imaginable trial strategy could justify the behavior. *See Andrews*, 159 S.W.3d at 102. Nor does the record before us reflect

whether appellant desired the strategy at the time, or what counsel's subjective reasons were for pursuing it. Because the record is silent as to such matters, we will not speculate as to counsel's reasons for failing to request the instruction. *Vasquez v. State*, 830 S.W.2d 948, 950–51 (Tex. Crim. App. 1992); *Perez v. State*, 56 S.W.3d 727, 732 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (holding appellant failed to show counsel was ineffective for failing to request a lesser included offense instruction for a smaller quantity of cocaine where record was silent as to counsel's reasoning).

### C. The record does not show ineffective assistance in counsel's handling of testimony from appellant's sister.

Appellant also complains her counsel was ineffective with respect to testimony from appellant's sister Juana that she once observed appellant strike the complainant with a belt in Judith's presence. Appellant contends her counsel was ineffective in failing to (1) object to the testimony as unfairly prejudicial under Texas Rule of Evidence 403; (2) request a limiting instruction on that testimony; and (3) request a burden-of-proof instruction regarding the incident.

### 1. Appellant has not shown prejudice from counsel's failure to object to the testimony under Rule 403.

In order to show prejudice from a failure to object, appellant "must show that he would likely have been successful on appeal had the issue been properly preserved." *Ex parte Moore*, 395 S.W.3d at 158. Appellant has not argued that the testimony at issue was not relevant, but rather that even relevant testimony may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403.

A trial court's ruling under Rule 403 is reviewed for an abuse of discretion. *Pawlak v. State*, 420 S.W.3d 807, 810 (Tex. Crim. App. 2013). A Rule 403 analysis includes such factors as "(1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Wright v. State*, 178 S.W.3d 905, 923 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). The court's ruling admitting evidence does not provide a basis for reversal if it is within the zone of reasonable disagreement. *Pawlak*, 420 S.W.3d at 810.

Although we acknowledge that "misconduct involving children [is] inherently inflammatory," *Montgomery v. State*, 810 S.W.2d 372, 397 (Tex. Crim. App. 1990) (op. on reh'g), appellant has not shown that the trial court would have committed reversible error had it concluded from balancing these factors that the testimony's prejudicial force did not substantially outweigh its probative value.

Appellant concedes that the first 403 factor weighs in favor of admission because the testimony was probative of the relationship between appellant and the complainant. Appellant then contends that the fourth factor weighs in favor of exclusion because the State had ample evidence to establish the relationship between appellant and the complainant without relying on Juana's testimony.

Juana's testimony had other probative value, however. A central issue in the case was whether the jury found credible appellant's statements of belief in alternative explanations for the complainant's injuries. As such, appellant's candor during her interviews with Officer Swainson was highly probative. Appellant admitted to physically disciplining the complainant, but only with her hand. Evidence that appellant had also struck the complainant with a belt could undermine the inference that appellant was fully cooperating with the

22

investigation, rather than attempting to conceal abuse. As such, the testimony was probative not only as to the type of discipline appellant imposed on the complainant—and the level of restraint she exercised while doing so—but also as to appellant's credibility.

With regard to the second factor, appellant contends the testimony had the potential to impress the jury in an irrational but indelible way because "[i]t provided an avenue for the jury to assume that appellant abused her child, or was at least complicit in her being abused when this testimony merely evidenced an act of discipline." Appellant's argument assumes that if she had a disciplinary purpose, the physical discipline she administered cannot constitute abuse. We disagree. *See Hill v. State*, 883 S.W.2d 765, 770 (Tex. App.—Amarillo 1994, pet. ref'd) ("Appellant, despite counseling in 1984 in avoidance of physical punishment . . . physically abused the children, often saying, 'Spare the rod, spoil the child . . . .'"). The trial court could reasonably have concluded that the jury was less likely to draw an irrational inference that appellant must abuse her child because she used physical force as discipline than it was to draw a rational inference that the discipline, as administered, could cause the type of blunt force trauma capable of producing the complainant's many injuries.

We hold appellant has not shown that it would have been outside the zone of reasonable disagreement for the trial court to conclude that the probative value of her sister's testimony was not substantially outweighed by the risk of unfair prejudice to appellant. Appellant has therefore not shown that she was prejudiced by her counsel's failure to object to the testimony under Rule 403.

23

**2. The record does not show appellant's counsel was deficient in failing to request limiting or burden-of-proof instructions for testimony regarding extraneous acts.**

Appellant also argues that her counsel should at minimum have requested limiting instructions regarding Juana's testimony that appellant struck the complainant with a belt. Appellant's analysis assumes that this incident constitutes extraneous conduct, although the State contends that the testimony related to allegations in appellant's felony murder charge. In the alternative, the State characterizes the evidence as same-transaction contextual evidence, which the State contends does not require a limiting instruction. *See Castaldo v. State*, 78 S.W.3d 345, 352 (Tex. Crim. App. 2002).

We need not decide whether the incident was an extraneous act because, even if we assume appellant's characterization is correct, appellant has not shown that the failure to request the instructions falls within the category of rare cases where no reasonable trial strategy could explain trial counsel's conduct. *See Perez*, 56 S.W.3d at 731. Although the Court of Criminal Appeals held in *Ex parte Varelas*, 45 S.W.3d 627 (Tex. Crim. App. 2001), that the failure to request such instructions constituted deficient performance, the Court did so while reaffirming its inability to determine ineffectiveness when the petitioner made the same claims on direct appeal, at which point the record was silent as to counsel's reasoning. *Id.* at 632. Because the record before us is similarly silent as to trial counsel's reasons for not requesting the burden-of-proof and limiting instructions, which would have drawn additional attention to the evidence, we hold appellant has failed to show that her counsel's performance fell below an objective standard of reasonableness.

We therefore overrule appellant's second issue.

24

## CONCLUSION

Having overruled both of appellant's issues, we affirm the judgment of the trial court.

/s/    J. Brett Busby
                Justice

Panel consists of Justices McCally, Busby, and Donovan.

Do Not Publish — TEX. R. APP. P. 47.2(b).