**Affirmed and Memorandum Opinion filed August 30, 2018.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00160-CR

---

**JACOB BROWN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 183rd District Court
Harris County, Texas
Trial Court Cause No. 1383715**

---

## M E M O R A N D U M   O P I N I O N

Appellant Jacob Brown appeals from his aggravated-robbery conviction. *See* Tex. Penal Code Ann. § 29.03(a)(2) (West 2016). Appellant raises two issues on appeal. Appellant argues that the evidence is insufficient to support his conviction because the State failed to establish his identity as the perpetrator. We overrule this issue because the cumulative effect of the admitted evidence was sufficient to establish appellant's identity as the person committing the aggravated robbery.

Appellant also contends that the trial court abused its discretion when it admitted evidence of extraneous offenses during the guilt/innocence phase of his trial. *See* Tex. R. Evid. 403, 404(b). We overrule this issue because the evidence of extraneous offenses rebutted appellant's identity defense, and the probative value of the evidence was not substantially outweighed by its prejudicial effect. We therefore affirm the trial court's judgment.

## BACKGROUND

The complainant, Yolanda Gould-Glaspy, and her daughter Jasmine drove to a Shell gas station near their home in the very early morning hours of June 14, 2012, to purchase gas and snacks. After she had put gas into her car, a silver Pontiac, Gould-Glaspy walked to the gas station window to buy candy and a drink. Due to the late hour, Stephanie Krob, the gas station attendant, already had locked the station's doors and was conducting business only through a "window drawer." Gould-Glaspy walked back to her car after making her purchase.

Jasmine was not satisfied with the candy bar her mother had bought, so she decided to exchange it for a different candy bar. Jasmine got out of the car and walked back to the gas station's after-hours window drawer. As Jasmine waited for Krob to exchange the candy bar, she saw a blue car pull into the gas station parking lot and stop parallel to the building. Jasmine saw the people inside the car putting on masks or bandanas. Jasmine described the bandanas as black with small white designs. Believing "something was getting ready to happen," Jasmine ran toward her mother's car. Jasmine heard a single gunshot as she ran.

Gould-Glaspy, who was waiting in the driver's seat of her car, saw Jasmine running, looking scared. Gould-Glaspy then saw a man get out of a blue car and chase after Jasmine with a gun pointed at Jasmine's back. According to Gould-Glaspy, all of the men who got out of the blue car were wearing dark clothing.

2

Jasmine made it to the Pontiac and she jumped into the rear seat on the driver's side. Almost immediately, the man chasing Jasmine came up to the window of the driver's door next to Gould-Glaspy. Gould-Glaspy could tell that the man beside her car was African-American because his bandana did not cover his entire face. The man pointed a gun at Gould-Glaspy's face and told her to get out of the car. Gould-Glaspy was paralyzed with fear and could not get out of the car. According to Jasmine, the man with the gun pulled her mother out of the car. Jasmine could not get out of the car because the child-locks were on, so the gunman opened the door and let her out of the car. Both women ran away down the street searching for help. The gunman then got into Gould-Glaspy's car and drove away along with the blue car. Neither woman could identify their assailants during appellant's trial.

Inside the store, Krob was searching for the candy bar Jasmine wanted when she heard a loud bang. Krob then heard a second bang. Krob turned toward the locked door; she saw shadows approaching and then a foot came through the door. Scared she was about to be killed, Krob ran for the station's bathroom, which she knew had a metal door that could be locked. Right after she entered the bathroom and locked the door, one of the men who had broken into the station tried to open the locked bathroom door. When the man could not open it, he told Krob to come out or he would shoot through the door. Krob refused. Krob then crawled under the sink, called 9-1-1, and waited for the police to arrive. Krob could not identify any of the men who broke into the Shell gas station.

Harris County Sheriff's Deputy Daniel Wareham was dispatched to the Shell gas station. Upon arriving at the station, Wareham saw bullet holes in the glass door and recovered two spent cartridge casings from the parking lot. Wareham also recovered a fired bullet from inside the store. No latent fingerprints or DNA were recovered at the gas station.

Surveillance videos were taken during the Shell station robbery. A still photograph taken from one of the videos shot by an outside camera shows a man firing a handgun with an extended clip toward the gas station building. Video taken of the gas station interior during the robbery shows two masked men wearing black, at least one of whom is African-American, entering the store through a shattered door, carrying handguns. A still photograph taken from a video shot by one of the interior surveillance cameras shows that one of the men placed a handgun with an extended clip on the store counter while he broke into the cash register.

Later that same day, about ten o'clock in the evening, Cherry Simons and her husband went to a Dairy Queen for a late dinner. As Simons waited inside for their order to be prepared, two men entered carrying guns and wearing black masks over their faces. One of the men pointed a gun at Simons and grabbed her purse. Simons saw that there was another man waiting outside in a getaway car. After taking her purse and the cash register drawers, the men fled. Simons was unable to recall what race the men were or provide any identifying information about them.

Carmen Flores was also at the Dairy Queen during the robbery. A new employee of the restaurant, Carmen had just completed her shift. Carmen remained in the restaurant to order food for her brother, Romel Flores, who was waiting outside for her in their father's truck. Carmen had Romel's credit card to pay for the food. As Carmen waited for her brother's food to be prepared, two men walked into the restaurant. Both wore masks and black clothing. Although Carmen could not tell the men's race, she could see they were both dark-skinned. The men ordered Carmen to get down on the floor and one of the men took her orange purse. One of the men took another woman's purse while the second man went to the back of the restaurant. The two men then moved toward the restaurant's register and ordered the people inside the restaurant to get out. Carmen ran to her father's truck.

4

Romel saw the men pull into the Dairy Queen parking lot in a silver Pontiac. Romel watched as the car came to a stop in the middle of the parking lot. Romel did not pay much attention to the car or its occupants until he saw his sister running out of the restaurant and into the truck. Carmen told Romel the men had taken her purse and were robbing the Dairy Queen. Romel then saw the men run out of the Dairy Queen, get into the silver Pontiac, and drive off. Romel followed the Pontiac for several blocks. He gave up the pursuit because the Pontiac was driving too fast and was running red lights. Romel turned the truck around and drove back to the Dairy Queen. Neither Carmen nor Romel could identify the men who had robbed the Dairy Queen. Romel testified, however, that the men were African-American.

The police found Gould-Glaspy's Pontiac the next morning abandoned in the parking lot of an apartment complex. The car had a broken window and there were bullet holes in it. The police found two fired cartridge casings inside the car. The police also found: a Texas driver's license issued to Simons; Carmen's orange purse, wallet, make-up, and social security card; and a credit card belonging to Romel. The police processed the car for fingerprints and DNA evidence. They did not find any fingerprints but did collect DNA samples from 21 areas of the car, including the gearshift. Carmen testified during appellant's trial that she had never been inside the Pontiac recovered by the police.

The trial court also admitted evidence regarding an earlier attempted robbery. Late in the evening of March 19, 2012, Carla Martinez went to a Valero gas station to put air in her tires. The Valero was located near the Shell gas station where the charged robbery would occur in June. Martinez's toddler son was in the car, asleep in his car seat. Martinez had finished putting air in her tires and was sitting in the driver's seat calling her mother when she noticed someone approaching her car. Martinez locked her car's doors right before an African-American man wearing a

dark ball cap and a dark sweater or hoodie walked up to her car and pulled on the driver's door handle. The man told Martinez to open the door. The man pointed a gun at Martinez's head through the car window. Worried about her son, Martinez refused to get out and tried to drive away, but she put the car into neutral instead of drive. Martinez was able to put the car in drive and began pulling away when the man fired the gun at her car. The bullet did not hit Martinez or her son. Martinez drove to her home about two minutes away. When she got out of her car, she discovered a black and white bandana stuck in the driver's door handle. She did not recognize the bandana and it had not been in the door handle when she got back in her car after putting air in her tires. Martinez's mother called the police.

Harris County Sheriff's Deputy Tommy Berry responded to the call. Martinez was visibly upset when Berry arrived. Martinez told Berry what had happened at the Valero. Although Martinez had been able to see the man with the gun, she could not remember how he looked. Berry saw that Martinez's car had been damaged. Upon closer examination, Berry found a bullet lodged in the window frame of Martinez's car. Berry collected the bullet. He also took the black and white bandana. Berry then went to the Valero gas station, where he recovered a spent .45 caliber cartridge casing near the station's air pump.

Sergeant Michael Burrow with the Houston Police Department obtained information that the casings found at the Shell gas station robbery were connected to .40 caliber cartridge casings found during a criminal investigation in New Orleans, Louisiana. Burrow arranged to have the New Orleans cartridge casings transferred to Houston. Kim Zeller is a firearms examiner at the Houston Forensic Science Center. Zeller was asked to compare the casings found at the Shell gas station robbery scene, the two casings found in Gould-Glaspsy's recovered Pontiac, and the casings from the New Orleans investigation. Zeller determined that the casings from

6

all three locations had been fired by the same weapon.

Sergeant Burrow testified that appellant became a suspect in the carjacking of Gould-Glaspy's car.[1] Sergeant Burrow then obtained a search warrant for appellant's DNA. Forensics examiner Rebecca Mikulasovich compared the DNA obtained from appellant to the DNA obtained from the gearshift of Gould-Glaspy's Pontiac. Mikulasovich's analysis indicated that there was a mixture of DNA on the gearshift and there were one major male contributor and two minor male contributors. Mikulasovich opined that appellant could not be excluded as a possible major contributor to the DNA mixture found on the gearshift. Mikulasovich further opined that the major contributor DNA found on the gearshift "is expected to occur . . . once in 24,680,000 African[-]Americans." Mikulasovich was unaware of when the DNA was deposited on the gearshift. Mikulasovich also testified it was possible that appellant's DNA was transferred to the gearshift by someone who had come into contact with appellant who subsequently touched the gearshift.

The bandana Martinez found lodged in her car's door handle was also examined for DNA. The analysis of the DNA sample taken from one side of the bandana revealed a mixture of DNA from at least three individuals. The analyst determined that there were a major contributor and two minor contributors. The analyst compared the DNA from the bandana with appellant's known DNA and determined that appellant could not be excluded as a possible major contributor. According to the analyst, the DNA profile for the major contributor found on the bandana is expected to occur once in 310 quadrillion African-Americans.

Burrow learned that an acquaintance of appellant's, Kerry Dixon, might have

---

[1] It was revealed during the punishment phase of the trial that Burrows was investigating a homicide when he learned information that led to appellant becoming a suspect in the Shell station carjacking.

information regarding the Shell robbery. Dixon knew Kevin Lewis, appellant's neighbor, and Dixon frequently saw Lewis and appellant together. Dixon visited Lewis's apartment in late June 2012. Lewis and appellant were present. Dixon talked with Lewis and appellant as the two men counted money in the apartment's living room. Dixon claimed that Lewis and appellant discussed robberies in his presence. Dixon saw that both men had handguns. According to Dixon, both weapons were .40 caliber handguns with extended magazines capable of holding 32 bullets. Dixon admitted during appellant's trial that he was a convicted felon serving time in prison and that he hoped he would get a parole letter from the State after he testified.

During closing argument, appellant emphasized the lack of any eyewitness testimony identifying him as the person who stole Gould-Glaspy's car. Appellant also argued that Dixon's testimony was not credible. Despite these arguments, the jury found appellant guilty of aggravated robbery. The case proceeded to the punishment phase, where the jury heard evidence of appellant's previous armed robbery convictions in Louisiana, of his involvement in a murder committed in Harris County, and of an aggravated assault appellant committed while escaping after the Dairy Queen robbery. The jury sentenced appellant to life in prison and assessed a $10,000 fine. This appeal followed.

### ANALYSIS

I.  **Legally sufficient evidence supports appellant's conviction of aggravated robbery.**

Appellant contends in his second issue that the evidence is insufficient to support his conviction of aggravated robbery because (1) he was not identified by any of the witnesses who testified during the trial, and (2) the DNA found on the stolen Pontiac's gearshift did not place him at the scene of the crime because "it

8

could have been deposited hours after the commission of the robbery." We address this issue first because, if successful, it would afford appellant the greatest relief. *See* Tex. R. App. P. 43.3; *Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (stating reviewing court should address complaints affording greatest relief first).

## A.    Standard of review and applicable law

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 433 U.S. 307, 318–19 (1979)). In analyzing legal sufficiency, we consider all evidence from the record, whether admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013) (citing *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). In viewing the evidence in the light most favorable to the verdict, we must "defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (citing *Jackson*, 433 U.S. at 319). In conducting a sufficiency review, we do not engage in a second evaluation of the weight and credibility of the evidence but only ensure that the jury reached a rational decision. *Young v. State*, 358 S.W.3d 790, 801 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). Direct and circumstantial evidence are treated equally. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury may reasonably infer facts from the evidence as it sees fit. *Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.). When the record supports conflicting inferences, we presume the trier of fact resolved the conflicts in favor of the verdict and defer to that

determination. *Clayton*, 235 S.W.3d at 778. Circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

A person commits aggravated robbery if he commits robbery and he uses or exhibits a deadly weapon. Tex. Penal Code Ann. § 29.03(a)(2). A person commits robbery if, in the course of committing theft with the intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id.* at § 29.02(a)(2) (West 2011). A firearm is a deadly weapon. *Id.* at § 1.07(a)(17) (West 2011).

The State must prove beyond a reasonable doubt that the defendant is the person who committed the charged offense. *Bradley v. State*, 359 S.W.3d 912, 916 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). Identity may be proven by direct evidence, circumstantial evidence, or even reasonable inferences made from available evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009); *Bin Fang v. State*, 544 S.W.3d 923, 928 (Tex. App.—Houston [14th Dist.] 2018, no pet.). When there is no direct evidence of the perpetrator's identity elicited from trial witnesses, there is no one method or formalized procedure the State must use to prove the identity of the perpetrator. *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd). In that circumstance, the sufficiency of the evidence is determined from the cumulative effect of all of the evidence; each fact in isolation need not establish the guilt of the accused. *See Wiggins v. State*, 255 S.W.3d 766, 771 (Tex. App.—Texarkana 2008, no pet.) (citing *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987)).

**B.     Legally sufficient evidence established appellant's identity as the perpetrator of the Shell carjacking.**

Appellant emphasizes on appeal the lack of eyewitness identification that he

was the person who stole Gould-Glaspy's Pontiac at the Shell station. But the lack of eyewitness identification is not determinative; it is instead a factor for the jury to consider in evaluating the evidence of a defendant's guilt. *See Wiggins*, 255 S.W.3d at 771 ("The absence of an in-court identification is merely a factor for the jury to consider in assessing the weight and credibility of the witnesses' testimony."). Although it is true no eyewitness identified appellant as the person who stole Gould-Glaspy's Pontiac at gunpoint, the record contains other evidence from which the jury could reasonably infer appellant was the perpetrator.

Gould-Glaspy testified that the gunman who forced her out of her car was African-American. The DNA analyst testified that appellant, who is African-American, could not be excluded as a major contributor to the DNA found on the gearshift of Gould-Glaspy's car and that the DNA combination found on the gearshift was likely to occur in the general population only once in every 24,680,000 African-Americans. During cross-examination, the analyst admitted that she could not pinpoint the time when the DNA was deposited on the gearshift and also that it was possible another person had transferred appellant's DNA to the gearshift. The jury heard Gould-Glaspy testify that she did not allow anyone else to drive her car, that she did not know appellant, and that appellant would have had no legitimate reason to drive her car.

The jury also saw the surveillance videos and still photographs taken from the surveillance videos showing that one of the Shell station robbers carried a handgun with an extended magazine. Dixon testified that he saw appellant and Lewis together in late June 2012 counting money they had taken during a robbery. According to Dixon, both men had .40 caliber handguns with extended magazines. The jury also heard evidence that the cartridge casings found at the Shell gas station had been fired by the same gun that fired the .40 caliber casings found at a New Orleans crime

11

scene and in Gould-Glaspy's recovered Pontiac. After hearing appellant's cross-examination of the trial witnesses as well as his closing argument emphasizing the lack of eyewitness testimony placing him at the scene of the charged aggravated robbery, the jury convicted him of aggravated robbery.

We conclude that, when viewed in the light most favorable to the verdict, the cumulative force of the admitted evidence was legally sufficient for a reasonable jury to find that appellant committed aggravated robbery.[2] *See Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015) ("[W]here the inferences made by the factfinder are reasonable in light of 'the cumulative force of all the evidence when considered in the light most favorable to the verdict,' the conviction will be upheld."); *Clayton*, 235 S.W.3d at 778 ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination."). We overrule appellant's second issue.

## II. The trial court did not abuse its discretion when it overruled appellant's objections to evidence of extraneous offenses.

In his first issue, appellant argues that the trial court abused its discretion when it admitted (1) evidence about the Dairy Queen and Valero robberies, (2) testimony briefly mentioning a criminal investigation in New Orleans in late June 2012, and (3) Dixon's testimony that he saw appellant, with a .40 caliber handgun in Lewis's apartment in late June 2012, discussing robberies. In appellant's view, the trial

---

[2] To the extent appellant argues that the evidence is insufficient to support his conviction because Dixon's testimony lacked credibility, the jury was made aware of Dixon's criminal history as well as his hope that he would receive a parole letter after he testified, and the jury still found appellant guilty of aggravated robbery. The jury's choice to believe Dixon's testimony does not render the evidence insufficient to support appellant's conviction. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) ("The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimonies, and the reviewing court must not usurp this role by substituting its own judgment for that of the jury.").

12

court's admission of this evidence violated Texas Rules of Evidence 404(b) and 403 because the extraneous offenses were not similar enough to the charged offense and the probative value of the extraneous-offense evidence was substantially outweighed by the danger of unfair prejudice.

### A. Standard of review and applicable law

Rule 404(b) provides that "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b). Rule 404(b) excludes only evidence offered for the sole purpose of proving bad character and conduct in conformity with that bad character. *De la Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). Rule 403 states that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

Evidence of extraneous offenses is admissible if relevant to other matters, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident." Tex. R. Evid. 404(b); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). The rule's list is illustrative only, and evidence of extraneous offenses also may be admissible to rebut a defensive theory. *Mason v. State*, 416 S.W.3d 720, 740 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *Hudson v. State*, 112 S.W.3d 794, 801 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) ("It is well settled that extraneous offense and prior bad acts evidence is admissible to rebut a defensive theory."). The proponent of extraneous-offense evidence "need not 'stuff' a given set of facts into one of the laundry-list exceptions set out in Rule 404(b), but he must be able to explain to the trial court, and to the

13

opponent, the logical and legal rationales that support its admission on a basis other than 'bad character' or 'propensity' purpose." *De la Paz*, 279 S.W.3d at 343. Thus, a party may introduce extraneous-offense evidence if it logically serves to make more or less probable (1) an elemental fact, (2) an evidentiary fact that inferentially leads to an elemental fact, or (3) rebuts a defensive theory. *Mason*, 416 S.W.3d at 740; *Hartsfield v. State*, 305 S.W.3d 859, 871 (Tex. App.—Texarkana 2010, pet. ref'd).

Whether evidence of extraneous offenses has relevance apart from character conformity is a question for the trial court. *Devoe*, 354 S.W.3d at 469. We review a trial court's ruling on the admissibility of such evidence for abuse of discretion. *De la Paz*, 279 S.W.3d at 343. We will uphold a trial court's ruling if it is within the zone of reasonable disagreement. *Id.* at 343–44. A trial court's ruling admitting evidence of extraneous offenses generally is within the zone of reasonable disagreement if the evidence shows that (1) the extraneous offense is relevant to a material, non-propensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *De la Paz*, 279 S.W.3d at 344.

**B.     The trial court did not abuse its discretion when it overruled appellant's Rule 404 objection.**

Appellant's identity as the perpetrator was contested throughout trial. Appellant repeatedly emphasized the lack of eyewitness testimony identifying him as the person who stole Gould-Glaspy's car at gunpoint. Mikulasovich, the DNA analyst, testified that appellant could not be excluded as a major contributor to the DNA found on the gearshift of Gould-Glaspy's car. During cross-examination, however, Mikulasovich admitted she could not determine when the DNA was placed on the gearshift. Mikulasovich also acknowledged it was possible that appellant's

DNA had been transferred to the gearshift by some other person. Appellant then argued that because the State could not establish exactly when the DNA was put on the gearshift, it did not prove appellant was the person who took Gould-Glaspy's car.

When a defendant places his identity in issue, the State may offer evidence of extraneous offenses to prove his identity if there is some distinguishing characteristic common to both the extraneous offense and the charged offense. *Sharper v. State*, 485 S.W.3d 612, 621 (Tex. App.—Texarkana 2016, no pet.); *see Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008) (stating that one of main purposes for admitting extraneous-offense evidence is to prove offender's identity). No rigid rules dictate what similarities suffice to render an extraneous offense admissible. *Hartsfield*, 305 S.W.3d at 872. The common characteristics that may make two crimes sufficiently similar include proximity in time and place, mode or manner of commission of the crimes, the person's dress, or any other element that mark both crimes as having been committed by the same person. *Id.*

To prove appellant's identity, the State introduced evidence of two other crimes: the attempted carjacking at the Valero and the Dairy Queen robbery. The Valero attempted carjacking shared numerous similarities with the Shell carjacking: it occurred late at night at a gas station in the same geographic area of Houston; it involved a man armed with a handgun wearing dark clothing approaching the car and ordering the driver out of the car; and it involved a bandana. The bandana was found stuck in the car's door handle after the Valero incident. Appellant could not be excluded as a major contributor to the DNA found on that bandana.

The Dairy Queen robbery also had numerous similarities. It occurred in darkness on the same day as the Shell robbery in the same geographic area. The robbers drove up to the Dairy Queen in Gould-Glaspy's car, and they used a similar

method: multiple armed men wearing dark masks and dark clothing entered the restaurant, where they quickly took the cash register drawers before departing the scene.

We conclude there were sufficient similarities between the extraneous offenses and the charged offense that the trial court reasonably could have determined the extraneous offenses were relevant to the issue of identity, as well as to rebut appellant's defensive theory that his DNA could have been placed on the gearshift at a time other than the Shell carjacking or by some other person. *See Segundo*, 270 S.W.3d at 89 (stating that the "DNA found in both murder victims matched appellant's DNA profile—it is as if appellant left his calling card in both Vanessa and Maria or carved a 'Z' upon their foreheads as his unique signature"); *Chaparro v. State*, 505 S.W.3d 111, 118 (Tex. App.—Amarillo 2016, no pet.) (stating that "admission of the extraneous offenses established a modus operandi of the robberies including the use of gloves, distinctive Halloween masks, a shotgun, and a large knife"); *Mason*, 416 S.W.3d at 741 ("We conclude the evidence of extraneous offenses admitted at trial was highly probative of appellant's identity as the perpetrator and thus relevant to a fact of consequence in the case apart from its tendency to prove conduct in conformity with character.").

The State also sought to prove appellant's identity through Dixon's testimony and the ballistics expert's opinion regarding the .40 caliber shell casings found as part of a New Orleans criminal investigation. The ballistics expert opined that the .40 caliber cartridge casings recovered at the Shell station and from the interior of Gould-Glaspy's car had been fired by the same gun that had fired the New Orleans cartridge casings. Dixon testified that he saw appellant with a .40 caliber handgun with an extended magazine the same month as the Shell carjacking. We conclude this testimonial and ballistics evidence was relevant to appellant's identity because

16

it inferentially linked appellant to the Shell carjacking. *See Sharper*, 485 S.W.3d at 622 (holding evidence that gun used in extraneous offense was the same gun used in charged crime was relevant to issue of identity). For these reasons, we conclude the trial court did not abuse its discretion when it determined that the evidence of extraneous offenses was relevant to the material, non-propensity issue of identity.

We note that as part of his issue, appellant asserts this evidence "failed to fall under any of the delineated purposes in [Rule] 404(b)." In addition to identity, he generally discusses the types of evidence that show motive, intent, preparation, plan, and knowledge. He then summarizes the evidence of extraneous offenses and, as to certain offenses, argues the evidence is not relevant to show motive, intent, preparation, plan, or knowledge. Because the trial court did not abuse its discretion in determining the evidence was relevant to identity, we need not analyze these other purposes in order to conclude that the admission of the evidence did not violate Rule 404(b). *See De la Paz,* 279 S.W.3d at 343 ("The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character.").

Appellant also asserts in passing that the limiting instructions the trial court gave in connection with admitting this evidence were overbroad. In the instructions, the court told the jury that it "may only consider the [evidence of other alleged offenses by the defendant] in determining the motive, opportunity, intent, preparation, plan, knowledge, or identity of the defendant in this case." In appellant's view, the trial court erred by instructing the jury that it could consider the evidence for purposes of motive, opportunity, or intent, as those purposes were not advanced by the State or relevant to any issue raised. Assuming without deciding that the trial court erred in including these purposes in the instructions, we conclude that error is harmless because the instructions properly held in check the prohibited

17

inference of character conformity, and the additional purposes amounted to surplusage that the jury could readily disregard because those purposes were not relevant to the trial. *See Hung Phuoc Le v. State*, 479 S.W.3d 462, 472 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Blackwell v. State*, 193 S.W.3d 1, 16 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

### C. The probative value of the extraneous-offense evidence was not substantially outweighed by the danger of unfair prejudice.

Having determined that the challenged evidence was relevant and that Rule 404(b) does not prohibit its admission, we next consider whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Tex. R. Evid. 403; *De La Paz*, 279 S.W.3d at 344; *Berry v. State*, 233 S.W.3d 847, 857 (Tex. Crim. App. 2007) (explaining difference between Rule 404 and 403 objections); *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) ("When a further objection is made under Rule 403, it will not suffice for the trial court simply to determine that the evidence is relevant to some legitimate, non-character-related purpose such as one of those enumerated in Rule 404(b).").

We review a trial court's ruling on a Rule 403 objection for abuse of discretion. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Relevant evidence may be excluded under Rule 403 if the trial court concludes that the evidence's probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needless presentation of cumulative evidence. Tex. R. Evid. 403. Factors a court may consider include "(1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence." *Hernandez v. State*, 390

S.W.3d 310, 324 (Tex. Crim. App. 2012).

As discussed above, we already have determined that the evidence of extraneous offenses was relevant to the disputed issue of appellant's identity. As such, the trial court reasonably could have concluded that the probative value of the evidence was high and the State's need for it was also high. *See Karnes v. State*, 127 S.W.3d 184, 193 (Tex. App.—Fort Worth 2003, pet. ref'd) (stating that "when identity is a 'hotly contested issue,' the State's need to offer evidence of an extraneous offense is strong"); *Beltran v. State*, 99 S.W.3d 807, 810–11 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding extraneous-offense evidence did not violate Rule 403 because it was crucial to show motive for crime).

With respect to the second factor, the trial court reasonably could have decided that the evidence was not so inherently inflammatory as to induce the jury to render a decision on an improper basis such as emotion rather than on the probative force of the evidence. *See Casey v. State*, 215 S.W.3d 870, 884 (Tex. Crim. App. 2007) ("The State had no other means to rebut the defense theories, and this rebuttal evidence was not offered merely to excite emotions against the defendant."). The third factor focuses on the time devoted to the evidence, during which the jury is distracted from considering the charged offense. Although the State devoted a large amount of trial time to presenting the extraneous-offense evidence to the jury, the trial court reasonably could have concluded that the time was not excessive given the importance of the evidence to the State's case. *See Karnes*, 127 S.W.3d at 193. Balancing these factors, the trial court reasonably could have concluded that the probative value of the extraneous-offense evidence was not substantially outweighed by the danger of unfair prejudice. We therefore hold that the trial court did not abuse its discretion by overruling appellant's Rule 403 objection. *See Mason*, 416 S.W.3d at 741 (holding extraneous-offense evidence not

unfairly prejudicial because it linked defendant to crime).  We overrule appellant's first issue.

## CONCLUSION

Having overruled appellant's issues on appeal, we affirm the trial court's judgment.

/s/    J. Brett Busby
       Justice

Panel consists of Chief Justice Frost and Justices Busby and Wise.
Do Not Publish — TEX. R. APP. P. 47.2(b).